**McGuire Woods LLP**
Matthew C. Kane, Esq. (SBN 171829)
Email: mkane@mcguirewoods.com
Bethany A. Pelliconi, Esq. (SBN 182920)
Email: bpelliconi@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA 90015
Telephone: (310) 315-8200
Facsimile: (310) 315-8210

Attorneys for Defendant
PAYCHEX, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

IRONFORGE.COM, individually and for all others similarly situated,

Plaintiff,

vs.

PAYCHEX, INC.

Defendant.

CASE NO. CV08-06818 SVW (JWJx)

**MOTION TO TRANSFER VENUE OF ACTION TO WESTERN DISTRICT OF NEW YORK:**

**(1) NOTICE OF MOTION**

**(2) REQUEST FOR JUDICIAL NOTICE**

**(3) MEMORANDUM OF POINTS AND AUTHORITIES**

**(4) DECLARATION OF BETHANY PELLICONI**

**(5) DECLARATIONS OF:**
- **DAVID VOGT**
- **JOHN BYRNE**
- **MICHAEL DEATS**
- **REBECCA WAGNER**
- **BRIAN MADRAZO**

*[Each Under Separate Cover]*

**(6) [PROPOSED] ORDER**
*[Under Separate Cover]*

**DATE: February 9, 2009**
**TIME: 1:30 p.m.**
**CTRM: 6**
**JUDGE: Hon. Stephen V. Wilson**

# TABLE OF CONTENTS

**Page**

**NOTICE OF MOTION** .......... iv

**REQUEST FOR JUDICIAL NOTICE** .......... v

**MEMORANDUM OF POINTS AND AUTHORITIES** .......... 1

**I. INTRODUCTION** .......... 1

**II. STATEMENT OF FACTS** .......... 3

- **A. Plaintiff's Claims And Attorneys** .......... 3
- **B. Paychex's Business** .......... 3
- **C. Key Paychex Employee Witnesses** .......... 6
- **D. Access To Proof** .......... 9
- **E. Key Third Party Witnesses** .......... 10

**III. THIS ACTION SHOULD BE TRANSFERRED TO THE WESTERN DISTRICT OF NEW YORK** .......... 11

- **A. Legal Standard Applicable To Motion To Transfer Venue** .......... 11
- **B. This Action Could Have Been Brought In The Western District Of New York** .......... 12
- **C. Paychex's Key Employee Witnesses Are Located In The Western District of New York** .......... 13
- **D. The Majority Of The Putative Class Members Are Located In The Eastern United States** .......... 15
- **E. The Key Third Party Witnesses Are Located In New York And On The East Coast** .......... 16
- **F. The Sources Of Proof Relevant To The Claims Alleged In The Complaint Are Located In The Western District Of New York** .......... 17
- **G. The Interests Of Justice Favor A Transfer Of This Action To The Western District Of New York Because Plaintiff And The Putative Class Members Have Written Service Agreements With Paychex Which Have New York Choice Of Law And New York Arbitration Forum Selection Provisions** .......... 18

**IV. CONCLUSION** .......... 20

**DECLARATION OF BETHANY PELLICONI** .......... 21

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986) .......... 19

*Evancho v. Sanofi-Aventis U.S., Inc.*, 2007 WL 1302985, *3 (N.D. Cal. 2007) .......... 13, 14, 15

*Florens Container v. Cho Yang Shipping*, 245 F.Supp.2d 1086, 1092 (N.D. Cal. 2002) .......... 16

*Foster v. Nationwide Mut. Ins. Co.*, 2007 WL 4410408 *4-5 (N.D. Cal. 2007) .......... 13, 14

*Freeman v. Hoffman-LaRoche Inc.*, 2007 WL 895282 *2 (S.D.N.Y. 2007) .......... 14

*Hoefer v. U.S. Dept. of Commerce*, 2000 WL 890862 (N.D. Cal. 2000) .......... 13, 14

*International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) .......... 12

*Italian Colors Restaurant v. American Express Company*, 2003 WL 22682482 (N.D. Cal. 2003) .......... 17, 18

*Johns v. Panera Bread Co.*, 2008 WL 2811827 (N.D. Cal. 2008) .......... 12, 13

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) .......... 11

*Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) .......... 12

*Saleh v. Titan Corporation*, 361 F.Supp.2d 1152, 1160 (S.D. Cal. 2005) .......... 16

*Silver Valley Partners, LLC v. De Motte*,
2006 WL 2711764 (W.D. Wash. 2006) .......... 18

*Teknekron Software Sys. Inc. v. Cornell Univ*.,
1993 WL 215024 (N.D. Cal. 1993) .......... 14

*Van Dusen v. Barrack*,
376 U.S. 612, 616 (1964) .......... 11

*Waldmer v. SER Solutions, Inc*.,
2006 WL 314346 (D. Kan. 2006) .......... 14

*Williams v. Bowman*,
157 F.Supp.2d 1103, 1106 (N.D. Cal. 2001) .......... 12

**FEDERAL STATUTES**

9 U.S.C. § 3 .......... 19

9 U.S.C. § 4 .......... 19

28 U.S.C. § 1332(d)(2)(A) .......... 1, 12

28 U.S.C. § 1391(a) .......... 1, 12

28 U.S.C. § 1404(a) .......... 1, 11, 18

Fed.R.Civ.Proc. Rule 45(b)(2) .......... 16

# NOTICE OF MOTION

**TO THE PLAINTIFF IRONFORGE.COM AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 9, 2009 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 6 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California 90012, Defendant PAYCHEX, INC. will and hereby does move the Court to transfer venue of this action to the Western District of New York on grounds of convenience pursuant to 28 U.S.C. § 1404(a).

This Motion is based on this Notice, the attached Request for Judicial Notice, Memorandum of Points and Authorities and Declaration of Bethany Pelliconi, the Declarations of David Vogt, John Byrne, Michael Deats, Rebecca Wagner, and Brian Madrazo filed concurrently herewith, the Court's file and records in this action, all matters which may be judicially noticed pursuant to Rule 201 of the Federal Rules of Evidence, and such other and further evidence and arguments as may be presented to the Court at or before the hearing on this Motion.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3 which Defendant's counsel attempted to initiate with Plaintiff's counsel on November 24, 2008, who failed to engage in any such conference with Defendant's counsel. (*See* Pelliconi Decl., 1:5-19; Exhs. A, B.)

DATED: December 12, 2008 **MCGUIREWOODS LLP**

By: /s/ Matthew C. Kane
Matthew C. Kane
Bethany A. Pelliconi
Attorneys for Defendant PAYCHEX, INC.

## REQUEST FOR JUDICIAL NOTICE

**TO THE HONORABLE STEPHEN V. WILSON AND TO PLAINTIFF IRONFORGE.COM AND ITS ATTORNEYS OF RECORD:**

**REQUEST IS HEREBY MADE**, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the following documents in connection with Defendant Paychex, Inc.'s Motion to Transfer Venue To Western District of New York:

1. Plaintiff Ironforge.com's Complaint filed in this action, a true and correct copy of which is annexed as Exhibit C to the attached Declaration of Bethany Pelliconi.

2. Sections 1.8 and 2.1 of the 2008 Operating Rules of the National Automated Clearing House Association, a true and correct copy of which is annexed as Exhibit D to the attached Declaration of Bethany Pelliconi.

DATED: December 12, 2008

**MCGUIREWOODS LLP**

By: /s/ Matthew C. Kane

Matthew C. Kane
Bethany A. Pelliconi
Attorneys for Defendant PAYCHEX, INC.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Paychex, Inc. ("Paychex") is a leading provider of payroll, human resources, and benefits outsourcing solutions for small to medium sized businesses. Plaintiff Ironforge.com's relationship with Paychex is governed by a written service agreement containing a New York choice of law provision and a New York arbitration forum selection provision. In addition, Paychex's corporate headquarters and principle place of business are in Rochester, New York, and Plaintiff is being represented in this action by attorneys from New York. Notwithstanding, and in violation of the binding provisions of its service agreement with Paychex, Plaintiff is attempting to bring this putative nationwide consumer class action asserting only claims under California law against Paychex in this Court venued in California.

As we discuss below, this action should be transferred to the **Western District of New York** pursuant to 28 U.S.C. § 1404(a), on grounds of convenience, for the following reasons:

1. **Venue is proper in the Western District of New York** pursuant to 28 U.S.C. § 1391(a) because Paychex's ***principal place of business***, including its ***corporate headquarters***, is located in ***Rochester, New York***. Therefore, Plaintiff could have brought this action in the Western District of New York, which has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). The Complaint alleges that the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and that some members of the putative class are citizens of states different than Paychex.

2. **Virtually all of the key third party witnesses are located in New York or in the eastern United States**. Many of those third party witnesses are subject to compulsory process in the Western District of New York.

3. **All seven of Paychex's corporate offices are located in the greater Rochester, New York area**. This includes Paychex's corporate headquarters, which is located in Rochester, New York.

4. **All of Paychex's key employee witnesses are located in the Rochester, New York area**.

5. **More than 58% of the putative class members are located in the eastern United States** (based on the allegations of the Complaint). Only 17% of the putative class members are located in California.

6. **Sources of proof relevant to this matter are stored on computer servers and in paper files physically located in Rochester, New York**. These sources of proof are not easily accessible elsewhere.

7. **All putative class members have written service agreements with Paychex that contain New York choice of law and Rochester, New York arbitration forum selection provisions.** Further, the electronic funds transfer clearing house regulations which govern Paychex's processing of the transactions at issue in this action contain a New York choice of law provision as well.

8. **Plaintiff's attorneys are located in New York**. Only Plaintiff's nominal "Liason Counsel" is located in California.

Therefore, Paychex's motion should be granted and this action should be ordered transferred to the Western District of New York.

## II. STATEMENT OF FACTS

### A. Plaintiff's Claims And Attorneys

Plaintiff's Complaint (Doc. #1), a true and correct copy of which is attached hereto as Exhibit C, asserts claims on behalf of itself and a putative class of all persons similarly situated, defined as follows: "All persons in the United States who have been or currently are Paychex customers from March 28, 2003, to October 15, 2008." (Exh. C, 3:18-23.) The claims asserted in the Complaint are based on Plaintiff's allegations that Paychex (1) falsely advertises that it does not charge "hidden fees," (2) charges its clients hidden or unauthorized fees and penalties, and (3) unlawfully profits from the "interest float" on client funds which it withdraws from its clients' bank accounts and then holds for a period of time before those funds are paid out by Paychex to pay its clients' payroll and tax obligations. (Exh. C, 6:13-12:14.)

Plaintiff is represented in this action by attorneys Yasmeen Allen and Craig Lanza of the Balestriere Lanza PLLC law firm in New York. (*See* Exh. C.) They only have nominal "Liason Counsel" in California. (*Id.*)

### B. Paychex's Business

Paychex is a leading provider of payroll, human resources, and benefits outsourcing solutions for small to medium sized businesses. (Byrne Decl., 1:7-8; Wagner Decl., 1:6-7). Its corporate headquarters and principal place of business are located in Rochester, New York. (Madrazo Decl., 1:4-6; Byrne Decl., 1:15-15-19.) In addition to its corporate headquarters, Paychex has six other corporate offices

located in the Rochester, New York area.  (Byrne Decl., 1:15-18; Deats Decl., 1:5-7.)

Paychex offers its electronic payroll services (e.g., its Direct Deposit, Taxpay® and Readychex® services) to its clients through a batch-oriented electronic funds transfer ("EFT") system referred to as the "ACH Network" (ACH stands for "Automated Clearing House").  (Wagner Decl., 1:7-11; Deats Decl., 1:13-17.) Paychex also uses the ACH Network to debit funds for other services products, including its retirement service record keeping, Section 125 Plan, and insurance administration services ("Additional Services").  (Wagner Decl., 1:13-15.)  Most clients receiving electronic payroll and Additional Services pay their fees through an EFT payment.  (Wagner Decl., 1:15-17.)

The ACH Network is a payment network that uses national standards for clearing interbank EFT payments between customers of participating depository financial institutions.   (Wagner Decl., 1:10-12; Byrne Decl., 1:12-14.)   It is governed by rules promulgated and enforced by the National Automated Clearing House Association ("NACHA"), which itself is governed by depository financial institutions. (Wagner Decl., 1:18-21.)  The Federal Reserve Bank and the Electronic Payments Network act as ACH Operators, which are central clearing facilities through which financial institutions transmit or receive ACH payment transactions. (Deats Decl., 1:17-19; Vogt Decl., 1:12-14.)

Paychex requires that all of its electronic payroll services and Additional Services clients sign a written services agreement which expressly provides that it is governed by the laws of the State of New York, and that any dispute arising out of the agreement shall be determined by binding arbitration in Rochester, New York. (Byrne Decl., 3:12-18.)  For example, Plaintiff's service agreement provides in relevant part as follows:

///

> "**11. Governing Law and Arbitration.** The Agreement shall be governed by the laws of the State of New York. Except as provided herein, any dispute arising out of, or in connection with, the Agreement shall be determined by binding arbitration in Rochester, New York, in accordance with the commercial rules of the American Arbitration Association. . . ." (Byrne Decl., Exh. A, at ¶ 11.)

In addition, the rules promulgated by NACHA, which govern both Paychex and its electronic payroll services clients, are expressly incorporated into the Paychex service agreements in accordance with NACHA rules. For example, Plaintiff's service agreement provides in relevant part:

> "**4. Electronic Funds Transfers.** All EFTs are performed in compliance with the National Automated Clearing House Association operating rules ("NACHA"). Client agrees to follow and be bound by NACHA as they are amended from time to time and assumes the responsibilities of an initiator of EFTs. . . ." (Byrne Decl., Exh. A, at ¶ 4; *see also* Exh. D [NACHA Rule 2.1].)

The NACHA rules, which Plaintiff and the putative class members "agree[] to follow and be bound by" likewise contain a New York choice of law provision:

> SECTION 1.8 Choice Of Law
>
> These rules and the rights and obligations of a party with regard to a credit entry subject to Article 4A shall be construed in accordance with and governed by the laws of

the State of New York, unless otherwise provided in an agreement of such party. (*See* Exh. D.)

**C. Key Paychex Employee Witnesses**

All of Paychex's corporate decisions are made by its authorized employees who work in its corporate offices located in the Rochester, New York area, and all of its policies and procedures are created and disseminated from those offices. (Byrne Decl., 2:23-3:5.) Such decisions, policies, and procedures include (1) procedures for providing client payroll processing services, (2) protocols for handling client complaints, (3) setting pricing and fees for client services, (4) client billing guidelines, (5) protocols for discounting fees for client services, (6) client service agreement provisions, (7) protocols for the timing of transmitting ACH transaction batch files for each service that Paychex provides, (8) protocols for handling interest income earned on client funds held in Paychex's corporate accounts, (9) creation of training materials for sales representatives, and (10) creation of corporate marketing and advertising materials. (*Id*.)

While Paychex branch office personnel provide some services to clients, the actual debiting of funds from client bank accounts for electronic payroll services and Additional Services is performed by Paychex corporate office employees located in Rochester, New York. (*Id.*, 3:6-9.) Further, Additional Services such as 401k Record Keeping, Section 125 Plan Record Keeping, and Insurance Administrative Services are all provided to clients by Paychex corporate office employees located in the Rochester, New York area. (*Id*., at 3:9-11.)

Paychex's corporate employees who would testify about and/or be involved with the defense of the claims alleged in the Complaint are all located in the Rochester, New York area. These employees include the following individuals:

///

///

///

1. **David Vogt, Paychex's Manager Treasury Operations**.  Mr. Vogt is responsible for managing: (1) Paychex's Cash Management Group, which is responsible for the daily cash management process that determines the cash positions in Paychex's bank accounts; (2) Paychex's Client Funds Accounting Group; and (3) Paychex's bank relationships for its corporate and operating accounts.  By virtue of his position, Mr. Vogt would be able to testify on behalf of Paychex about client fund accounting and records pertaining thereto, interest earned on client funds, and interactions between Paychex and the banks which process its clients' ACH transactions.  (Vogt Decl., 1:16-3:5); Madrazo Decl., 2:11-13.)

2. **John Byrne, Paychex's Manager of Strategic Operations.**  Mr. Byrne is the "Lead Data Owner" of Paychex's core payroll product and billing systems.  He would testify on behalf of Paychex about the records stored in Paychex's core payroll and online repository systems, which store client documents in automated databases on its computer servers physically located in Rochester, New York.  Mr. Byrne would also testify about Paychex's corporate policies and procedures, including those relating to processing client payroll services, client service agreements, and setting pricing and fees for client services. (Byrne Decl., 1:21-3:20; Madrazo Decl., 2:3-5.)

3. **Rebecca Wagner, Paychex's HRS Analyst III**.  Ms. Wagner is responsible for ensuring Paychex's operations are in compliance with all applicable banking and NACHA regulations.  She also

handles client disputes where a client believes charges for Paychex's services were not authorized. Ms. Wagner would testify about Paychex's compliance with banking regulations and NACHA rules, protocols used by Paychex for the timing of client bank account debit transactions and the timing of related payroll check and tax remittance payments made by Paychex on behalf of clients with their debited funds. She would also testify about the protocols used by Paychex for handling complaints from clients about purported unauthorized fees and transactions. (Wagner Decl., 1:3-2:8; Madrazo Decl., 2:6-7.)

4. **Michael Deats, Paychex, Inc.'s ENS Product and Opertions Manager**. Mr. Deats is responsible for supervising and managing Paychex's Electronic Network Services ("ENS") Product and Operations Department. That department monitors incoming files containing payroll instructions for Paychex's client accounts nationwide, and ensures that the ACH files containing those instructions are received by Paychex's partner banks, which, in turn, transmit the instructions to the clients' and/or their employees' banks and the banks of various state and federal agencies. Mr. Deats would testify about Paychex's payroll operations, monitoring of incoming payroll files containing payroll instructions for Paychex, Inc.'s clients nationwide, and procedures for ensuring that the ACH files containing payroll instructions are received by Paychex, Inc.'s partner banks. (Deats Decl., 1:3-2:19; Madrazo Decl., 2:8-10.)

///
///

5. **Neil Rohrer, Director of Marketing**. Mr. Rohrer would testify about Paychex's marketing policies, protocols, and marketing materials distributed to clients. (Madrazo Decl., 2:2:14-16.)

6. **Joni McManus, Advertising Manager**. Ms. McManus would testify about Paychex's advertising policies, procols, and advertising materials distributed to clients. (Madrazo Decl., 2:17-19.)

7. **Kimberly Kelly, Training Center Director**. Ms. Kelly would testify about the training of Paychex's sales representatives. (Madrazo Decl., 2:20-22.)

8. **Brian Madrazo, Paychex's In-House Corporate Counsel**. Mr. Madrazo is not a witness in this matter, but he is responsible for managing this litigation, and he resides and works in the Rochester, New York area. (Madrazo Decl., 1:2-26.)

**D. <u>Access To Proof</u>**

Paychex currently has approximately 557,000 payroll services clients. (Byrne Decl., 2:7.) More than 58% of those clients (i.e., the putative class members alleged in the Complaint) are located in the eastern United States. (*Id.*, 2:6-9.) Only about 17% of those putative class members are located in California. (*Id.*, 2:6-10.)

Virtually all of Paychex's records on these clients (and any clients receiving Additional Services), including records pertaining to invoicing, the debiting of funds from client accounts and the remittance of funds to client employees and tax authorities, are maintained in separate electronic databases which are stored on Paychex's computer servers physically located in the Rochester, New York area. (*Id.*, 2:11-16.) These records include client service agreements and new account

documents, client complaints about purported unauthorized transactions, and records reflecting ACH transactions processed on behalf of clients. (*Id.*, 2:16-18.) Access to these databases is generally not available to Paychex employees located outside of its corporate offices in the Rochester, New York area, except for certain employees who have limited access to only portions of the databases for specified purposes. (*Id.*, 19-22.)

In addition, Paychex's corporate banking records are all stored on its computer servers physically located in the Rochester, New York area as well. (Vogt Decl., 2:21-3:5.) Paychex's client banking records are likewise physically located exclusively in the Rochester, New York area. (*Id*.)

**E. Key Third Party Witnesses**

Paychex processes its clients' ACH transactions primarily through the Operational Centers of Bank of America, Wells Fargo Bank, PNC Bank, and JP Morgan Chase Bank. (Vogt Decl., 2:2-4.) Bank of America also sponsors Paychex to send ACH files directly to the Electronic Payment Network ("EPN").[1] (Vogt Decl., 2:4-5.) The primary Operational Centers for these financial institutions are located in Florida, Pennsylvania, Minnesota, Virginia, and North Carolina; only one is located in California (San Francisco). (Vogt Decl., 2:8-10).

Of these financial institutions, JP Morgan Chase Bank, PNC Bank, Wells Fargo Bank, and Bank of America each have a "Relationship Officer" who oversees all aspects of its interactions with Paychex, including management of the service agreements pertaining to ACH transactions, opening and closing of accounts and services, credit needs, treasury services, and operational issue resolution. (*Id.*, 2:11-15.) The Relationship Officers for JP Morgan Chase and Bank of America are both located in Rochester, New York. (*Id.*, 2:17-18.) The Relationship Officer for Wells

---

[1] EPN is comprised primarily of financial institutions and is the only private-sector ACH Operator in the country. (Vogt Decl., 2:5-6).

Fargo Bank is located in New York City, and the Relationship Officer for PNC Bank is located in Greenwich, Connecticut. (*Id.*, 2:18-20).

Employees from the Operational Centers of these financial institutions, and their Relationship Officers, would likely be called upon to testify in this action about their interactions with Paychex concerning ACH transactions and whether any of the transactions at issue in this action involved errors on the part of their financial institutions. Indeed, Plaintiff alleges in the Complaint that one of its own representatives had several conversations with Wells Fargo Bank about stopping the alleged unauthorized transactions in his account and that Plaintiff's representative discussed with a Wells Fargo Bank representative whether the transactions were a result of the bank's error. (*See* Exh. C, 12:21-13:13.)

## III. <u>THIS ACTION SHOULD BE TRANSFERRED TO THE WESTERN DISTRICT OF NEW YORK</u>

### A. <u>Legal Standard Applicable To Motion To Transfer Venue</u>

28 U.S.C. § 1404(a) provides as follows:

> "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

The purpose of this statute is to "prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). A motion to transfer the venue of an action lies within the broad discretion of the district court and is to be determined on an individualized, case by case basis. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).

The following factors are to be considered by a district court in deciding whether to grant a motion to transfer venue under 28 U.S.C. § 1404(a):

(1) the plaintiff's choice of forum (which is entitled to only "minimal consideration" in a class action lawsuit);[2]

(2) the convenience of the parties and witnesses;

(3) the ease of access to sources of proof;

(4) familiarity of each forum with the applicable law;

(5) feasibility of consolidation with other claims;

(6) local interest in the controversy; and

(7) relative court congestion.

*See Lou v. Belzberg*, 834 F.2d at 739; *Williams v. Bowman*, 157 F.Supp.2d 1103, 1106 (N.D. Cal. 2001); *Johns v. Panera Bread Co.*, 2008 WL 2811827 (N.D. Cal. 2008).

**B. <u>This Action Could Have Been Brought In The Western District Of New York</u>**

The Western District of New York has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). Plaintiff's Complaint alleges that the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and that some members of the putative class are citizens of states different than Paychex. (*See* Exh. C, 2:16-20.)

Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391(a) because Paychex's principal place of business, including its corporate headquarters, is located in Rochester, New York. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (for venue purposes, a corporation resides in all districts in which it is subject to personal jurisdiction).

Moreover, Plaintiff is represented by attorneys in New York who either are admitted or could gain full admission (rather than being admitted *pro hac vice*) to

---

[2] *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).

the Western District of New York bar. (*See* Exhibit C.) Plaintiff only has nominal "Liason Counsel" located in California. (*Id.*)

**C. Paychex's Key Employee Witnesses Are Located In The Western District of New York**

In deciding whether to grant motions to transfer venue in class action lawsuits, district courts in the Ninth Circuit have uniformly held that the convenience of witnesses warrants granting the motion where, as here, the defendant's corporate headquarters and corporate witnesses are located in another jurisdiction, especially if a large number of the putative class members are located outside of the chosen jurisdiction. *See Johns v. Panera Bread Co.*, 2008 WL 2811827 (N.D. Cal. 2008) *3 (granting motion to transfer venue in wage and hour class action to place of defendant's corporate headquarters); *Foster v. Nationwide Mut. Ins. Co.*, 2007 WL 4410408 *4-5 (N.D. Cal. 2007) (granting transfer of FLSA and state wage and hour class action on grounds of convenience where defendant's corporate headquarters and many witnesses located in proposed transferee district); *Hoefer v. U.S. Dept. of Commerce*, 2000 WL 890862 (N.D. Cal. 2000) (granting motion to transfer on grounds of convenience in class action alleging illegal taxes where defendants' headquarters were in Washington and "crucial witnesses" were located there). *See also Evancho v. Sanofi-Aventis U.S., Inc.*, 2007 WL 1302985, *3 (N.D. Cal. 2007) (convenience of parties and witnesses favored transfer where large number of critical witnesses live and work in New Jersey, and greater proportion of putative class members live and work on east coast as compared to west coast).

In *Foster v. Nationwide Mutual Ins. Co.*, the U.S. District Court for the Northern District of California granted a motion to transfer venue to the Southern District of Ohio based on facts and circumstances similar to those which exist in this action. The plaintiffs had filed a putative wage and hour class action in the Northern District of California because one of the named plaintiffs lived there, the defendant had California offices, and a majority of the plaintiffs who had opted-in resided on

or near the West Coast. The defendant moved to transfer venue to the Southern District of Ohio, which was the location of its corporate headquarters and of its management-level employees who were likely to testify at trial. In granting the motion to transfer venue, the Court reasoned that:

> "Defendant asserts that the Southern District of Ohio will be more convenient for both parties and witnesses. The Court agrees. Defendant's corporate headquarters is located in Columbus, Ohio, as are many of the witnesses defendant would likely call to testify at trial. For instance, most of defendant's management-level employees who oversee the special investigators or work in human resources are based in Ohio; others work in Iowa and Florida, making Ohio more convenient for them as well." 2007 WL 4410408, at * 4.

*See also Hoefer v. U.S. Dept. of Commerce, supra* (noting, in granting motion to transfer venue, that "[l]itigation should proceed where the case finds its 'center of gravity,'" which was the location of the defendants' corporate offices and headquarters) (citing *Teknekron Software Sys. Inc. v. Cornell Univ*., 1993 WL 215024 (N.D. Cal. 1993)); *Evancho v. Sanofi-Aventis U.S. Inc., supra*, 2007 WL 1302985, at *3 (granting motion to transfer venue to New Jersey where "a large number of critical witnesses live and work in New Jersey, and a greater proportion of the putative class members live and work on the east coast than on the west coast"); *Freeman v. Hoffman-LaRoche Inc.*, 2007 WL 895282 *2 (S.D.N.Y. 2007) (location of defendant's corporate witnesses was important factor in deciding motion to transfer venue); *Waldmer v. SER Solutions, Inc.*, 2006 WL 314346 (D. Kan. 2006) (noting, in granting motion to transfer venue to Virginia, that "the logical

origin of this dispute is Virginia. It was at the company's headquarters in Virginia [where defendant's] personnel made and implemented the decision [at issue]. No company policies were ever established in Kansas.")

Here, as in the foregoing cited cases, the location of Paychex's employee witnesses and of putative class members favors a transfer of this action to the Western District of New York. All of Paychex's corporate witnesses are located in the Rochester, New York area, which is the location of Paychex's corporate headquarters and principal place of business. (Byrne Decl., 2:23-24; Madrazo Decl., 1:3-6, 1:27-2:24.) In addition to the Paychex employee witnesses identified above and who can be expected to testify about the claims alleged in the Complaint, virtually any other Paychex employee who would testify in this action is located at its corporate offices in the Rochester, New York area. (*Id;* Deats Decl., 1:3-7, 1:21-2:19; Vogt Decl., 1:3-6, 1:16-2:1, 2:21-3:2 .) Thus, it would be more convenient for these witnesses if the trial of this action occurred in the Western District of New York.

### D. **<u>The Majority Of The Putative Class Members Are Located In The Eastern United States</u>**

Further, the majority of Paychex's payroll services clients, who are the putative class members in this action (as alleged in the Complaint), are located in the eastern United States. (Byrne Decl., 2:6-9.) Only 17% of those putative class members are located in California. (*Id.*, 2:8-10.) Therefore, it would be more convenient for the putative class members if the trial of this matter were to take place in Western District of New York as well. *See Evancho v. Sanofi-Aventis U.S. Inc.*, *supra*, 2007 WL 1302985, at *3 (granting motion to transfer venue to New Jersey where "a large number of critical witnesses live and work in New Jersey, and a greater proportion of the putative class members live and work on the east coast than on the west coast").

### E. The Key Third Party Witnesses Are Located In New York And On The East Coast

The convenience and location of key third party witnesses is one of the most important factors in deciding whether to grant a motion to transfer the venue of an action on grounds of convenience. *See Saleh v. Titan Corporation,* 361 F.Supp.2d 1152, 1160 (S.D. Cal. 2005); *Florens Container v. Cho Yang Shipping*, 245 F.Supp.2d 1086, 1092 (N.D. Cal. 2002).

Here, the most critical third party witnesses are the Relationship Officers and the Operations Center employees from the financial institutions which process Paychex's clients' electronic payroll transactions. (*See* Vogt Decl., 2:2-25.) These third party witnesses can be expected to testify about ACH transactions involving Paychex and its clients, instructions transmitted by Paychex with respect to those transactions, and whether any of the transactions at issue in this action constituted mistakes by their financial institutions. (*Id.*) Indeed, Plaintiff's own Complaint alleges that Plaintiff's own representative had communications of this nature with a representative of Wells Fargo Bank. (*See* Exh. C, 12:25-13:13.)

The Relationship Officers at these financial institutions are located in Rochester, New York, New York City, and Greenwich, Connecticut. As such, if this action is transferred to the Western District of New York, it would be more convenient for these third party witnesses and most of them would be subject to compulsory process by subpoena. *See* Fed.R.Civ.Proc. Rule 45(b)(2) (for nonparty witnesses, the court's subpoena power extends to any place within the district and/or within 100 miles of the place of trial).

The Operations Center employees at these financial institutions are located in Florida, Pennsylvania, Virginia, and North Carolina; only one of the Operations Centers is located in California (San Francisco). (Vogt Decl., 2:2-10.) As such, the Western District of New York also would be a much more convenient forum for these witnesses as compared to California.

**F. The Sources Of Proof Relevant To The Claims Alleged In The Complaint Are Located In The Western District Of New York**

Virtually all of Paychex's corporate and client records and documents are maintained in separate databases stored on its computer servers physically located in the Rochester, New York area. (Byrne Decl., 2:11-3:11; Deats Decl., 2:5-19; Vogt Decl., 2:21-3:5; Wagner Decl., 2:1-8.)

These records include client service agreements and new account documents, records pertaining to the electronic payroll services and Additional Services actually provided to clients, client complaints about purported unauthorized transactions, records reflecting ACH transactions processed on behalf of Paychex clients, corporate policies, procedures, and protocols for processing client payroll services, banking records reflecting the interest earned by Paychex on its cash positions, client banking records, corporate banking records and advertising and marketing materials. (*Id*.)

All of these records and documents would likely be key sources of proof on issues raised in Plaintiff's Complaint as to whether the transactions were authorized, whether misstatements were made concerning fees, and the timing of the debit and credit transactions at issue. (See Exh. 1, 1:6-2:14; 6:13-14:6.) Access to Paychex's records is generally not available to Paychex employees outside of its corporate offices in the Rochester, New York area, except for certain employees who have limited access to portions of Paychex's databases for specified purposes. (Byrne Decl., 19-22.)

Due to the sheer volume and location of Paychex's records maintained in separate restricted-access databases for over a half million of its clients, and of related and additional hard copy evidence, it is axiomatic that principles of convenience favor a transfer of this action to the Western District of New York. *See, e.g., Italian Colors Restaurant v. American Express Company*, 2003 WL 22682482 (N.D. Cal. 2003) (granting motion to transfer venue to district where

defendant's principal place of business was located because "the cost of litigation will be substantially lessened if the action is venued in the same district where most of the documentary evidence is found.").

**G. <u>The Interests Of Justice Favor A Transfer Of This Action To The Western District Of New York Because Plaintiff And The Putative Class Members Have Written Service Agreements With Paychex Which Have New York Choice Of Law And New York Arbitration Forum Selection Provisions</u>**

All of Paychex's clients who utilize its electronic payroll services or Additional Services which require Paychex to debit funds from the client's bank account (i.e., Plaintiff and all of the putative class members as alleged in the Complaint) are required to execute written service agreements with Paychex that contain a New York choice of law provision, and that provide for binding arbitration in Rochester, New York. (*Byrne* Decl., 3:20; Exh. A, ¶ 11.) These agreements also incorporate the NACHA regulations governing Paychex's processing of the ACH transactions at issue in this action, which likewise contain a New York choice of law provision. (*See* Exhibit D; Byrne Decl., 3:12-20; Exh. A, ¶ 11.)

These factors weigh in favor of granting a transfer of this action to the Western District of New York. Indeed, as courts have noted, the existence of a contractual choice of law provision is a significant factor which favors granting a motion to transfer venue brought under 28 U.S.C. § 1404(a). *See Italian Colors Restaurant v. American Express Company*, 2003 WL 22682482 (N.D. Cal. 2003); *Silver Valley Partners, LLC v. De Motte*, 2006 WL 2711764 (W.D. Wash. 2006).

In addition, the Western District of New York would likely be more familiar with New York law, which must be applied in this action. (*See* Exhibit D; Byrne Decl., Exh. A, at ¶ 11.) This factor also favors granting a transfer of this action to the Western District of New York. *See, e.g., Silver Valley Partners, LLC v. De Motte*, *supra* (noting that district court where action would be transferred to would

be more familiar with the applicable law of the state in which it is located). *See also Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986) (diversity case should be litigated "in a forum that is at home with the law that must govern the action").

Further, Plaintiff and each of the individual putative class members have agreed to arbitrate their purported claims in Rochester, New York in accordance with the arbitration provision in Paychex's service agreements with them. (Byrne Decl., 3:12-20, Exh. A., at ¶ 11.) Under the Federal Arbitration Act, the Western District of New York would have jurisdiction to hear and decide petitions to compel arbitration of their claims. *See* 9 U.S.C. § 4 ("[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, . . . for an order directing that such arbitration proceed in the manner provided for in such agreement"). Likewise, New York law would have to be applied to resolve any challenges to enforcement of the arbitration agreements. *See* 9 U.S.C. § 3 ("[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). Thus, principles of judicial economy and efficiency also would be better served if these arbitration issues are addressed and resolved by the Western District of New York.

///

///

///

///

///

///

///

///

## IV. CONCLUSION

For all of the foregoing reasons, Paychex respectfully requests that this motion be granted and that this action be ordered transferred to the Western District of New York.

DATED: December 12, 2008

**MCGUIREWOODS LLP**

By: /s/ Matthew C. Kane
Matthew C. Kane
Bethany A. Pelliconi
Attorneys for Defendant PAYCHEX, INC.

## DECLARATION OF BETHANY PELLICONI

I, Bethany Pelliconi, declare as follows:

1. I am currently employed as Counsel in the law firm McGuireWoods LLP, counsel for Defendant Paychex, Inc. in this matter.

2. In accordance with Local Rule 7-3 of the Rules of Court for the U.S. District Court, Central District of California, on November 24, 2008 I sent a meet and confer letter by email to counsel for the Plaintiff in this matter, Craig Stuart Lanza, setting forth the basis for this Motion to Transfer Venue to the Western District of New York. Attached hereto as Exhibit A is a true and correct copy of that letter and email.

3. On December 8, 2008 I received an email from a Jakob Deitch from Mr. Lanza's office. In that email, Mr. Deitch stated that I would receive a response to my November 24, 2008 meet and confer letter by December 10, 2008. A true and correct copy of that email is attached hereto as Exhibit B.

4. I did not receive a response to my November 24, 2008 meet and confer letter on December 10, 2008 as promised by Mr. Deitch. Instead, on that date I received a response to another meet and confer letter. To date I have not received any response from Plaintiff's Counsel to my November 24, 2008 meet and confer letter

5. Attached hereto as Exhibit C is a true and correct copy of the Complaint on file in this matter, which was served on Paychex, Inc.

6. Attached hereto as Exhibit D is a true and correct copy of Sections 1.8 and 2.1 of the "2008 ACH Operating Rules" which I received from the National Automated Clearing House Association ("NACHA").

///

///

7. I am over 18 years of age. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently and truthfully testify thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed December 12, 2008, at Los Angeles, California.

Bethany Pelliconi

EXHIBIT A

**McGuireWoods LLP**
1800 Century Park East
8th Floor
Los Angeles, CA 90067
Phone: 310.315.8200
www.mcguirewoods.com

**Bethany A. Pelliconi**
Direct: 310.315.8205

MCGUIREWOODS

bpelliconi@mcguirewoods.com
Direct Fax: 310.315.8210

November 24, 2008

**VIA E-MAIL AND U.S. MAIL**

Craig Stuart Lanza
Balestriere Lanza PLLC
225 Broadway, Suite 2900
New York, NY 10007

Re: Ironforge.com v. Paychex, Inc.
USDC, C.D. Cal., Case No. CV 08-06818

Dear Craig,

This letter is written pursuant to the Court's Local Rule 7-3 in a good faith attempt to resolve informally Defendant Paychex, Inc.'s anticipated motion to transfer venue of this putative nationwide class action to the Western District of New York pursuant to 28 U.S.C. §1404(a).

The anticipated motion is based on, *inter alia*, the convenience of the parties, convenience of witnesses, judicial economy, and access to evidence. Virtually all of the foregoing is located primarily within the Western District of New York and, to a lesser extent, other east coast locales.

Please advise us whether Plaintiff will stipulate to transferring venue of this action to the Western District of New York and obviate the necessity for such a motion. If you would like to discuss this matter further, please contact me about setting up a mutually convenient time and location to do so. We look forward to your anticipated prompt response.

Sincerely,

MCGUIREWOODS LLP

/s/

Bethany Pelliconi

6737314.1

Almaty | Atlanta | Baltimore | Brussels | Charlotte | Charlottesville | Chicago | Jacksonville | Los Angeles
New York | Norfolk | Pittsburgh | Raleigh | Richmond | Tysons Corner | Washington, D.C. | Wilmington

EXHIBIT A

**Pelliconi, Bethany A.**

**From:** Jakob Deitch [jdeitch@balestriere.net]
**Sent:** Monday, December 08, 2008 10:16 AM
**To:** Pelliconi, Bethany A.
**Cc:** Craig Stuart Lanza; Kane, Matthew C.
**Subject:** Re: LR 7-3 meet and confer letter.DOC

Ms. Pelliconi,

I am writing to inform you that we plan on responding to your letter from November 24th by this upcoming Wednesday, December 10th. If you have any questions, please do not hesitate to contact me.

Best,

Jakob Deitch

Jakob Deitch
BALESTRIERE LANZA PLLC
225 Broadway Suite 2900
New York, NY 10007
Direct 212-374-5400 Ext. 125
Facsimile 212-208-2613
jdeitch@balestriere.net
www.balestriere.net

The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of the named recipient only. You are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this communication in error, please immediately notify the sender by replying to this e-mail or by calling us at 212-374-5400 and please immediately delete this communication. Thank you.

Pelliconi, Bethany A. wrote:
> Mr. Lanza, please see attached letter.
>
>

EXHIBIT C

Yasmeen Allen*
Craig Stuart Lanza *
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2900
New York, NY 10007
Telephone: (212) 374-5404
Facsimile: (212) 208-2613
*Attorneys for Plaintiff and the Class*

* *Admission pending pro hac vice.*

Lisa L. Maki
**LAW OFFICES OF LISA L. MAKI**
1111 South Grand Avenue
Suite 101
Los Angeles, CA 90015
Telephone: (213) 745-9511
Facsimile: (213) 745-9611
*Liaison Counsel for Plaintiff and the Class*

FILED
2008 OCT 16 PM 2:26
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY NL

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**IRONFORGE.COM**, individually and for all others similarly situated,

Plaintiff,

**PAYCHEX, INC.**,

Defendant.

Case No.: CV08-06818 SVW (JWJx)

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

I/S
20

EXHIBIT C

EXHIBIT C

TABLE OF CONTENTS

NATURE OF THE CASE ........ 1
JURISDICTION AND VENUE ........ 2
PARTIES ........ 3
CLASS ACTION ALLEGATIONS ........ 3
STATEMENT OF FACTS ........ 6
Payroll Services and Paychex ........ 6
Paychex Skims from Customer Accounts by Charging Unjustified Fees and Penalties that Clients Never Agreed to Pay. ........ 7
Paychex Keeps for Itself Interest Belonging to the Company-Clients by Deducting Funds for Payroll on Days Before Paychex Actually Pays the Company-Clients' Employees ........ 10
Paychex Withdraws Clients' Money to Pay Their Taxes Months Before the Taxes are Due ........ 12
Paychex's Fraud Involving Ironforge.com ........ 12
CAUSES OF ACTION AGAINST PAYCHEX ........ 14
Count 1—FRAUD ........ 14
Count 2—UNJUST ENRICHMENT ........ 16
COUNT 3—VIOLATION OF CAL. CIVIL CODE §§ 1750 ET SEQ. ........ 16
COUNT 4—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET. SEQ ........ 16
COUNT 5—VIOLATION OF CAL. BUS. & PROF CODE §§ 17500 ET SEQ ........ 18
COUNT 6—VIOLATION OF CAL. CIVIL CODE §§ 1709, 1710 ........ 19
COUNT 7—VIOLATIONS OF CAL. CIVIL CODE § 1572 ........ 20
COUNT 8—VIOLATIONS OF CAL. CIVIL CODE § 1573 ........ 22
COUNT 9—BREACH OF FIDUCIARY DUTY ........ 22
COUNT 10—CONVERSION ........ 24
COUNT 11—BREACH OF CONTRACT ........ 24
PRAYER FOR RELIEF ........ 26

EXHIBIT C

EXHIBIT C

JURY DEMAND ........................................................................................................................27

EXHIBIT C

EXHIBIT C

Plaintiff, by its attorneys Balestriere Lanza PLLC, for their Class Action Complaint respectfully alleges as follows against Paychex, Inc. ("Paychex" or "Defendant"), upon information and belief, except as to allegations concerning Plaintiff or its counsel, which are made upon personal knowledge, and except as otherwise indicated herein:

## NATURE OF THE CASE

1. Plaintiff and the class of other similarly situated businesses ("the Class", "Class Members," or "Company-Clients") are victims of an ongoing and insidious fraud. Payroll company Paychex has quietly engaged in a fraudulent scheme to fatten its bottom line by embezzling small sums of money from its customers, small businesses found in every state in the Nation. Over and over again, Defendant tells complaining customers that the withdrawals were merely innocent mistakes. Yet, the consistency of what might total literally millions of withdrawals across the Nation over years betrays a deliberate and lucrative fraud. Although each instance may add only a few cents or dollars to Paychex's profits, when aggregated over the life of the scheme for Paychex's *half a million* customers, the amount stolen adds up to tens if not hundreds of millions of dollars.

2. The fraud is simple: Paychex skims small amounts of money, month after month, year after year, from its clients, usually by arbitrarily increasing fees or by charging small, undisclosed fees which customers never agreed to pay. Defendant also skims small amounts of interest due its clients by deducting money used for payroll on one day, but not depositing that money into an employee's account until a later day. It, thus, keeps for itself the interest that its clients would be due if Paychex waited until the day of deposit to withdraw money from the clients' accounts. Paychex also prematurely withdraws money from clients' bank accounts to pay taxes, thus profiting yet another way from interest due to its clients. Further, on multiple occasions, Paychex has illegally withdrawn money from its clients' bank accounts—without authorization—and withheld the money until a client complains about the transaction (all these elements, collectively, "the Skimming Fraud"). In many cases, Paychex simply refuses to refund the money.

EXHIBIT C

Frustrated and preoccupied with running their own businesses, Class Members are forced to accept their losses and move on.

3. Paychex has exploited the fact that its typical customers are small- to medium-sized businesses that do not have the time or resources to set up in-house payroll systems. These businesses have small-scale operations with busy principals who specifically decide to spend money on a payroll company for the very reason that they do not have the time to monitor closely all aspects of payroll. The Company-Clients may have great sophistication in their areas of business, but not in payroll services and, for that reason, rely on Paychex—and pay fees to Paychex—for such services, trusting Paychex with confidential financial information and access to the Company-Clients' bank accounts. Thus, Paychex's small-sum-on-a-large-scale fraud has passed largely undetected, and completely unpunished and unabated, for years. Plaintiff brings this action to stop this fraud and seek some amends from Defendant for its long running Skimming Fraud.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

5. This Court has personal jurisdiction over Defendant Paychex because it conducts significant business in this District and in the State of California.

6. Pursuant to 28 U.S.C. § 1391(a), venue is proper in the Central District of California because a substantial part of the events from which this claim arises occurred in this District and because Plaintiff resides in this District.

## PARTIES

7. Plaintiff is a company that has been custom forging ironwork for architects, interior designers and discerning clients for fifteen years[1] who used Paychex's services from on or around March 28, 2003, to June 2007. Plaintiff resides in Los Angeles, California, in this district.

8. Defendant Paychex (symbol: PAYX) is a publicly traded corporation incorporated in the state of Delaware and headquartered at 911 Panorama Trail South, Rochester, New York 14625.

9. Paychex maintains at least one office in this District, including one at 300 Corporate Pointe, Suite 150, Culver City, California 90230.

10. Paychex has been in the business of providing payroll and human resources services for small companies for 30 years and has 572,000 customers and 12,200 employees.[2] During the fiscal year ending May 31, 2008, Paychex's total revenue was approximately $2.1 billion (a 9.5% increase from the previous year).[3] In its 2007 annual report, Paychex declared $100 million in earnings from "interest on funds held for clients," which amounts to a 67% increase from the previous year.[4]

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") in its representative capacity on behalf of themselves and the Class of all persons similarly situated, defined as follows:

> All persons in the United States who have been or currently are Paychex customers from March 28, 2003, to October 15, 2008 ("Class Period").

[1] http://www.ironforge.com/info.html (Last viewed: September 15, 2008).

[2] http://finance.yahoo.com/q/pr?s=PAYX (Last viewed: September 17, 2008).

[3] http://finance.yahoo.com/q/is?s=PAYX&annual (Last viewed: September 17, 2008).

[4] http://www.shareholder.com/visitors/DynamicDoc/document.cfm?CompanyID=PAYX&documentID=2001&PIN=&resizeThree=no&Scale=100&Keyword=type%20keyword%20here&Page=2 (Last viewed: August 27, 2008).

EXHIBIT C

EXHIBIT C

12. **Numerosity.** Although the exact number of Class Members is presently unknown to Plaintiff (but is known to the Defendant), Plaintiff believes that there are at least tens of thousands, if not hundreds of thousands, of Company-Clients, in every state in the Nation, defrauded by Paychex's Skimming Fraud. The members of the Class are so numerous that joinder of all members is clearly impracticable.

13. **Commonality.** A substantial pool of questions of law and fact exists that is common to the Class. Such common questions include, but are not limited to:

a. Whether Defendant added unjustified, previously undisclosed charges and "penalties" to Class Members' bills;

b. Whether Defendant made unauthorized withdrawals from Class Members' business bank accounts;

c. Whether Defendant retained salary funds belonging to the Company-Clients or the Company-Clients' employees for its financial benefit;

d. Whether Defendant prematurely withdrew money from Company-Clients' bank accounts for the purpose of paying taxes;

e. Whether individuals employed by or otherwise associated with Paychex planned and organized the Skimming Fraud;

f. Whether Defendant made any attempt to address any of Class Members' complaints regarding the Skimming Fraud; and

g. Whether, as a result of Defendant's misconduct, Plaintiff and the Class are entitled to restitution, disgorgement, equitable relief, other relief, and punitive damages and if so, the amount and nature of such relief or damages.

14. **Typicality.** Plaintiff's claims are typical of the claims of the Class. Plaintiff was an ordinary Paychex customer who, along with all Class Members, has been injured by the same wrongful acts and practices of Defendant as alleged herein.

15. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the interests of

EXHIBIT C

EXHIBIT C

the Class as a whole, and Plaintiff has engaged competent counsel experienced in the prosecution of complex and class litigation.

16. **Superiority.** A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated businesses to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations.

17. Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

18. **Maintainability.** This action is properly maintainable as a class action for the prior independent reasons and under the following portions of Rule 23:

a. The individual amounts of restitution involved, while of value, are generally so small that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b. Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

c. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and

d. Individual actions would unnecessarily burden the courts and waste judicial resources.

19. **Predominance.** Questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

EXHIBIT C

EXHIBIT C

20. Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class Members.

21. California, which almost certainly has more Company-Clients than any other state, is the center of gravity for this action such that it is appropriate and consistent with existing law to certify a nationwide class of consumers, applying California law.

22. Certification of a nationwide Class under the laws of California is also appropriate because:

a. Defendant conducts substantial business in California;

b. Defendant maintains more offices in California than any other state; and

c. A significant number of Class Members reside in California.

## STATEMENT OF FACTS

### Payroll Services and Paychex

23. Paychex is a company that offers payroll and related administrative and tax assistance to small businesses across the United States. A customer delegates most of its administrative and compliance tasks to Paychex and gives it access to all of the customer's and customer's employees' financial data to perform these services. These include calculation, preparation, and delivery of employee checks, as well as preparation and payment of federal, state, and local payroll taxes. Paychex targets clients with one to forty-nine employees, although it also has clients with more employees and its strategy for increasing profits is to attract more customers and add extra services for current clients.

24. Paychex is a publicly traded corporation with 12,200 employees and 572,000 corporate customers as of May 31, 2008.[5] Defendant's main source of revenue comes from recurring fees for payroll and human resources services. Its service revenue depends on the number of clients, the number of checks or transactions per client, and the ability to render ancillary services. Paychex also earns interest on funds held for

[5] Paychex Form 10-K for the fiscal year ended May 31, 2008.

EXHIBIT C

EXHIBIT C

clients between the time of collection from their clients and remittance to the tax or regulatory agencies or client employees and manages an investment portfolio.[6]

25. Paychex gets its clients by marketing itself to small and medium-sized businesses, usually with fewer than one hundred employees. According to Paychex's most recent 10-K statement filed with the SEC, the growth of the client base is achieved "primarily through the efforts of our direct sales force."[7] Additionally, Paychex's 2006 Annual Report outlines the way in which it gets clients through referrals:

> In addition to our direct selling and marketing efforts, we utilize relationships with existing clients, certified public accountants ("CPA's"), and banks for new client referrals. Approximately two-thirds of our new clients (excluding acquisitions) come from these referral sources. To further enhance our strong relationships with CPA's, we have partnered with the American Institute of Certified Public Accountants ("AICPA") as the preferred payroll provider for its AICPA Business Solutions Partner Program. During the year ended May 31, 2005, the program was expanded to include our Retirement Services and MMS.[8]

**Paychex Skims from Customer Accounts by Charging Unjustified Fees and Penalties that Clients Never Agreed to Pay.**

26. The most common—and easily hidden—form of fraud perpetrated as part of the Skimming Fraud is levying previously undisclosed and never justified fees. Because Paychex has a Company-Client's information, Paychex can slightly raise fees or

---

[6] http://www.secinfo.com/dsVS7.v5R7.htm#1stPage (last viewed August 27, 2008).

[7] Paychex Form 10-K for the fiscal year ended May 31, 2008.

[8] Paychex 2006 Annual Report.

EXHIBIT C

add new fees with ease. And that is exactly what Paychex does, for customer after customer, month after month, year after year.

27. Paychex's Company-Clients have complained about the Skimming Fraud for some time. But Paychex has done nothing about these complaints, having every incentive to maintain the fraud and fatten its profits. The following excerpts are examples of such complaints from the website "E-Opinions.com."[9] At this site, current and former Paychex clients have posted reviews about the Paychex's services. This is a sample; there are forty-seven reviews of Paychex, most of which are extremely negative, all posted because the busy Company-Clients principals were so frustrated by the Skimming Fraud that they spent some of their sacred time voluntarily posting complaints. This website is specifically designed to display consumer experiences with various service-oriented companies:

> [T]he Paychex branch manager seems *to intentionally "make mistakes"* on the invoices they send me. Watch out for overcharges, *the monthly fees seem to change at the will of the branch manager.*

> [T]hey treat their customers checking account like it was there [sic] own, *taking money out when ever they feel like it even if the numbers are in correct* [sic].

> We have had nothing but trouble with the sales side of paychex [sic]. They promised us a price on processing and on 401(k) *that did not turn out to be true,* and they have refused to make good on it. All I get are excuses. I might have to sue them. STAY AWAY!

[9] http://www.epinions.com/bsrv-Human_Resources-Payroll-All-Paychex_Payroll_Service/display_~reviews (Last viewed: August 27, 2008).

EXHIBIT C

I seem to be *consistently charged more than what was originally quoted to me*, sometime by as much as 40%. I thought I was going with a reputable company, and felt more comfortable after listening to both their salesperson and one from ADP.

Paychex is not the company anyone can even think off [sic]. It is an unprofessional and unorganized company. *The sales people will tell you some thing* [sic] *and the people inside does some thing* [sic] *different* and there is no clear co ordination [sic] between them. Also be careful in signing the documents with Paychex. They get the signature some how [sic] in one of those documents and *withdraw the money with out* [sic] *your notice.*

THE REAL ISSUE is when they come out to sell you their service they do not tell you about *HIDDEN CHARGES*. First of all, since they have access to your account, *they can basically take out whatever they want, whenever they want*. Also, if you leave them before the fourth quarter, they EXTORT *a never announced PENALTY* for you to get necessary tax forms. I wish I could go to the police department and file charges, because basically, *they stole money from me*.

I've been with Paychex for years, encountering inaccuracies, misspellings and penalties after penalties.

EXHIBIT C

EXHIBIT C

> I still get mail from the "signed" by an entire Paychex department for services we have canceled as long as 9 months ago and for services we never had.[10]

28. Yet another consumer complained on a different website descriptively called "Companies that Suck."[11] The customer mentions an esoteric "Mid Atlantic Trustee Fee" which Paychex charged him:

> Paychex 401k fees are high and absurd. I have 401k with them and they charged me almost 20% in fees on my contributions. They call the fee the "Mid-Atlantic Trustee Fee". Such a *high fee is unexplainable* and shows that they don't care about the end customer and only care about profit. If my employer didn't match my contribution I would need to earn 17% on my investment which is not plausible in most instances. Furthermore, *no statements* or account information I received from Paychex *gives information on how this fee is calculated*. . . .[12]

**Paychex Keeps for Itself Interest Belonging to the Company-Clients by Deducting Funds for Payroll on Days Before Paychex Actually Pays the Company-Clients' Employees**

29. Paychex also wrongly keeps interest due to Company-Clients. Defendant takes a Company-Client's money on one day, but then does not deposit it into an

---

[10] http://www.epinions.com/bsrv-Human_Resources-Payroll-All-Paychex_Payroll_Service/display_~reviews (All capitalized emphases in originals, all italics emphases added).

[11] http://blog.syracuse.com/news/2008/01/wegmans_no_3_on_fortunes_best.html (last viewed on September 11, 2008).

[12] http://blog.syracuse.com/news/2008/01/wegmans_no_3_on_fortunes_best.html (last viewed on September 11, 2008) (emphasis added).

EXHIBIT C

EXHIBIT C

employee's account until another future day—sometimes days later. The Company-Client loses interest that it would earn but for this misconduct.

30. One Paychex's Company-Client employee complains online that he could not withdraw money from his bank account because Defendant did not transfer the actual salary into the employees' account.[13] Only when this employee made a request to his bank for a certain sum did the money get transferred to the employee's bank account. Thus, Paychex kept the money for days longer than justified. The following is an excerpt from the employee's complaint:

> When an ATM, or any merchant, communicates with the Paychex computers and finds out that there is enough money in the account to cover the transaction, they give the OK to dispense the cash or the goods whatever . . . *but Paychex will not give up the money until the transaction is posted* i.e. until the bank, in this instance, actually asks for the cash. *All this time, Paychex still "has" the money, to do with as they will.* In this instance, if the bank had aleady given me the cash as it should have if the ATM machine worked correctly, the bank would be out the money until it posted the transaction. Only then would Paychex give it up. But they would have the cash "in their coffers" until then! Brilliant in a legal but ethically *sleazy* way. *Multiply this by hundreds of thousands of transactions and no wonder Paychex is doing so well* . . . .[14]

[13] The request happens when the ATM machine communicates with Paychex's system to get the money that the customer withdraws.

[14] http://www.ripoffreport.com/reports/0/245/RipOff0245232.htm (Last viewed: August 18, 2008) (emphasis added).

EXHIBIT C

EXHIBIT C

**Paychex Withdraws Clients' Money to Pay Their Taxes Months Before the Taxes are Due**

31. Additionally, Defendant abuses its responsibility to pay Company-Clients' taxes by extracting the tax money prematurely, thus profiting by earning unjustified interest, and then paying the tax to the IRS the day before taxes are due.

32. Michael Johnston, an independent CPA, outlines this practice thoroughly on his website:

> In some cases . . . Paychex's TaxPay clients are **having their tax dollars taken out of their checking accounts a full 15 weeks before they are due.** Yes, according to **IRS Publication 15**, small businesses with quarterly withholding taxes les than $2,500, do not have to pay these taxes over to the IRS until the last day of the month following the end of a quarter! For example, taxes withheld from January 1, through March 31, don't have to be deposited with the IRS until April 30th.[15]

**Paychex's Fraud Involving Ironforge.com**

33. Defendant Paychex injured Plaintiff Company-Client Ironforge.com through its ongoing and multifaceted fraudulent misconduct.

34. Plaintiff enrolled the payroll services of the Defendant on or around March 28, 2003, and then cancelled its services with Defendant in June, 2007.

35. After the cancellation, however, Defendant impermissibly withdrew monies from Plaintiff's bank account at Wells Fargo & Company ("Wells Fargo"). Defendant made two unauthorized withdrawals, each in the amount of $43.75, on August 10, 2007, and again on August 15, 2007.

36. Richard Bergin, the owner of Ironforge.com, called Wells Fargo in August 2007, to stop these initial unauthorized withdrawals, and Wells Fargo assured Bergin that

[15] http://www.about-accounting.com/paychex.aspx (Last viewed September 11, 2008) (emphasis in original).

EXHIBIT C

EXHIBIT C

the situation would be handled. However, after this initial call, Defendant withdrew *$308.74 from Bergin's bank account on August 31, 2007.*

37. Bergin again contacted Wells Fargo to stop the unauthorized withdrawals, and, again, the bank told Bergin that it would stop them. However, only days later, Defendant *again* withdrew *$101.74 from Bergin's bank account on September 10, 2007.*

38. A Wells Fargo employee told Plaintiff during a phone call that this was not the bank's fault. These withdrawals, the employee told Bergin, were most likely due to the Defendant switching the access number to the bank account after finding out that Plaintiff was attempting to block its access to the account.

39. As a result, Plaintiff was forced to close its bank account completely after being told by a Wells Fargo employee that this was the only option. This cost Plaintiff additional time, money, and frustration as well as approximately $1100 in unauthorized withdrawals, money Plaintiff is still due.

40. After *six months* of unauthorized withdrawals *after* Plaintiff cancelled the account with Paychex, Bergin made numerous calls to Paychex to try and resolve the situation. During a call made on or around March 12, 2008, and documented and posted on YouTube on March 14, 2008,[16] Bergin spoke with a Paychex representative named James Boulton ("Boulton"). Bergin tried to explain to Boulton that withdrawals were being made without Bergin's authorization. Boulton, however, said that the money owed to Bergin was "with the IRS" and that Bergin would have to go to the IRS to recoup his lost funds. Bergin reiterated to Boulton that he had cancelled his services with Paychex and that it was Paychex's responsibility to give Plaintiff its money back because the contract Plaintiff had was with Paychex, not the IRS.

41. Paychex's Boulton said several times that he would "sort out the situation," but he never did. Boulton also said that he would call Bergin back ten minutes after the end of the above referenced phone call but, as documented in the video, Bergin did not

[16] http://www.youtube.com/watch?v=5vU4XuddhTo (last viewed on September 22, 2008).

EXHIBIT C

EXHIBIT C

hear back from him and called him two days later, only to get Boulton's voicemail. Bergin never heard again from anyone at Paychex.

42. Defendant finally stopped stealing Plaintiff's money, but the damage had already been done.

43. Bergin's Company is like thousand or tens of thousands of others: ripped off as victims of Defendant's years long Skimming Fraud.

## CAUSES OF ACTION AGAINST PAYCHEX

### COUNT 1—FRAUD

44. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45. Plaintiff brings this claim individually and on behalf of the Class against Paychex.

46. Paychex misrepresented its fee charging policies and failed to disclose all charges that customers may be subject to in customer contracts. The Company also retained customer assets for a period of time without seeking authorization from customers and without notifying them, in the contracts or otherwise. Paychex also made false statements through its customer representatives when customers called to inquire why they are being charged.

47. Paychex's misrepresentations and omissions as to their fees are central to Plaintiff's decision to use the Company's services and they are, therefore, material. Plaintiff retained Paychex's services because it decided it would be more cost-effective to outsource their payroll processing to Paychex, than to have full-time employees perform this function. In making this determination, Plaintiff placed greatest importance on the monthly charges its company must budget in planning for their business operations. As a result, having to pay higher charges each month placed a substantial burden on Plaintiff's ability to anticipate its month-to-month expenses which makes Paychex's misrepresentations and omissions material.

EXHIBIT C

EXHIBIT C

48. There is a consistent pattern of repeated problems with customer accounts, all of which are detrimental to customers rather than Paychex proving that these transactions were deliberate. Every time Paychex withheld an employee's salary or withdrew money from a customer's bank account and retained it until the customer or employee complained, the Company made money because it retained the interest from holding the assets. Every time the Company charged a customer for services the customer did not sign up for, Paychex increased its revenue. The substantial financial benefit for Paychex leads to the inevitable conclusion that those transactions were not inadvertent but were a part of a deliberate scheme.

49. Paychex's customers relied on the Company's contractual representations of the cost of their services and on the customer representatives' explanation of what went wrong with their accounts. As a result, the customers not only signed up and paid for Paychex's "services" but also provided such sensitive and confidential information as their business' bank accounts and employee records. Further, Plaintiff's reliance on Paychex's representations was reasonable because from their perspective, it was unlikely that a reputable company and a leader in its industry would intentionally engineer a scheme to embezzle small sums. Plaintiff assumed that the Company was honest in charging its fees because it would be a stretch to presume that it was intentionally defrauding them, which was also what Paychex counted on in devising this scheme.

50. Moreover, Paychex's customers suffered financial loss when Paychex overcharged them for services, when they prolonged the return of funds it wrongfully withdrew and when its customers representatives made it difficult for customers to fix the Company's mistakes. Some customers also suffered reputational and operational injuries when they did not have enough funds to cover Paychex's withdrawals from their bank accounts and their business activities were stifled as a consequence.

51. Plaintiff and Class Members seek damages from Paychex including but not limited to disgorgement of all proceeds Paychex obtained from its fraudulent practices.

EXHIBIT C

EXHIBIT C

## COUNT 2—UNJUST ENRICHMENT

52. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53. Paychex received a benefit at Plaintiff's expense by (1) accumulating excess fees in connection with purportedly providing services to Plaintiff, (2) generating interest income from the monies it prematurely withdrew to pay taxes to the IRS, and (3) improperly withdrawing money from Plaintiff's own bank account.

54. It would be unjust for Paychex to retain any of these benefits because each and every benefit was procured as a result of fraud or other misconduct and without the consent or approval of Plaintiff.

## COUNT 3—VIOLATION OF CAL. CIVIL CODE §§ 1750 ET SEQ.

55. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56. Paychex has misrepresented or omitted the characteristics—specifically the fees charged and the process by which taxes are paid—of the services that it purports to provide company clients like Plaintiff.

57. Paychex has further misrepresented that it provides quality service when, in fact, its service is sub-standard, at best.

58. Paychex has further advertised that it provides quality services to company clients when, in fact, it charges customers like Plaintiff undisclosed fees, makes impermissible account withdrawals, and prematurely withdraws monies to be used for tax payments to the IRS.

59. Plaintiff has suffered damage as a result of Paychex's misrepresentations because it has lost money to Paychex's fraudulent moneymaking scheme.

## COUNT 4—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET. SEQ.

60. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 59 of this Complaint as if fully set forth herein.

EXHIBIT C

EXHIBIT C

61.     Paychex has engaged, and is still engaging, in unfair competition by engaging in (1) unlawful business acts or practices, (2) unfair business acts or practices, (3) fraudulent business acts or practices, (4) unfair, deceptive, untrue, or misleading advertising, and (5) acts prohibited by §§ 17500 to 17577.5.

62.     Paychex has committed unlawful business acts or practices, as discussed elsewhere in this complaint, by violating Cal. Bus. & Prof. Code §§ 17500 et seq. and Cal. Civ. Code §§ 1572, 1573, 1709, 1710, and §§ 1750 et seq.

63.     Paychex has committed unfair business acts or practices by continually accessing former customers' bank accounts, retaining employee salaries, sneaking in extra charges in customer's bills, and impermissibly withdrawing funds from customers' and former customers' accounts.

64.     Paychex has committed fraudulent business acts or practices by representing that it provides quality service and assists in paying taxes when, in fact, Paychex charges undisclosed fees and impermissibly withdraws monies from customers' and former customers' accounts.

65.     Paychex has committed unfair, deceptive, untrue, or misleading advertising by representing that it provides quality service and assists in paying taxes when, in fact, Paychex charges undisclosed fees and impermissibly withdraws monies from customers' and former customers' accounts.

66.     Paychex's wrongful conduct alleged herein is part of a pattern or generalized course of conduct that occurred and continues to occur in the ordinary course of Paychex's business.  Thus, Paychex's conduct impacts the public interest.

67.     Paychex's acts and practices have deceived and are likely to deceive consumers.

68.     Paychex's acts and practices are unlawful because they violate Civ. Code §§ 1572, 1573, 1709, 1710, 1750 et seq.,; Cal. Bus. & Prof. Code §§ 17500 et seq.  Specifically, when Paychex customers asked for explanation about problems with payroll or repeated withdrawals of money from their bank accounts, Paychex and its representatives

EXHIBIT C

EXHIBIT C

deliberately misled them by saying the transactions were inadvertent. These practices were deceptive and misleading for the customers because they were paying for services that they did not agree to and because Paychex used the pretext of "mistake" to deprive its customers and their employees from their assets for prolonged periods. It was reasonable for the Company's customers to believe that Paychex and its representatives were being honest because they were doing business with a large and well established corporation and it is unlikely that such company would bother with small scale fraud. However, this is exactly the line of reasoning Paychex relied on when it designed this scheme to pray on its customers.

69. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff, on behalf of itself and all members of the Class, seeks an order of this Court permanently enjoining Paychex from continuing to engage in its unfair and unlawful conduct as alleged herein. Plaintiff also seeks an order awarding full restitution of all monies wrongfully obtained.

## COUNT 5—VIOLATION OF CAL. BUS. & PROF CODE §§ 17500 ET SEQ.

70. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 69 of this Complaint as if fully set forth herein.

71. During the Class Period, Paychex marketed, advertised, and sold to the public payroll and tax services on a nationwide basis, including in California.

72. Paychex has engaged in the advertising and marketing alleged herein with the intent to directly or indirectly induce the use of their payroll and tax services.

73. Paychex's advertisements and marketing representations that their payroll services included no hidden fees and that their tax services would be performed in a way most beneficial to the Company-Client are false, misleading, and deceptive as set forth more fully above.

74. At the time it made and disseminated the statements alleged herein, Paychex knew or should have known that the statements were untrue, deceptive, or misleading and acted in violation of Cal. Bus. & Prof Code §§ 17500 et seq.

EXHIBIT C

EXHIBIT C

1      75.    Paychex actively concealed its knowledge that there were consistent hidden

2  fees and inappropriate withdrawals of Company-Clients' money without their

3  permission.

4      76.    Paychex's acts of untrue and misleading advertising present a continuing

5  threat to consumers because such advertisements induced consumers to purchase

6  Paychex's services, which are operated under false pretenses.

7      77.    As a result of the violations of California law described above, Paychex has

8  been and will be unjustly enriched at the expense of Plaintiff's and the members of the

9  Class. Specifically, Paychex has been unjustly enriched by continually charging hidden

10  fees and benefiting off the interest received from improperly withdrawn money. This

11  was all part of the services that were marketed, advertised, and sold in the State of

12  California and the United States through material misrepresentations regarding the

13  details of payroll and tax services.

14      78.    As a result of the violations of California law described above, Plaintiff and

15  the members of the Class have suffered injury in fact and have lost money.

16      79.    Plaintiff seeks restitution, injunctive relief, and all other relief allowable

17  under Bus. & Prof. Code §§ 17535 et seq.

18      **COUNT 6 — VIOLATION OF CAL. CIVIL CODE §§ 1709, 1710**

19      80.    Plaintiff repeats and realleges the allegations contained in paragraphs 1

20  through 79 in this Complaint as if fully set forth herein.

21      81.    Cal. Civ. Code § 1710 provides in relevant part that "deceit . . . is either:

22      (1)    The suggestion, as a fact, of that which is not true, by one who does

23          not believe it to be true;

24      (2)    The assertion, as fact, of that which is not true, by one who has no

25          reasonable ground for believing it to be true;

26      (3)    The suppression of a fact, by one who is bound to disclose it, or who

27          gives information of other facts which are likely to mislead for want

28          of communication of that fact; or,

EXHIBIT C

(4) A promise, made without any intention of performing it."

82. Paychex has violated and continues to violate Civ. Code § 1710(1) by suggesting that their payroll and tax services did not have any hidden fees and were performed in a manner most beneficial to the Company-Client, when Paychex did not believe this to be true.

83. Paychex has violated and continues to violate Civ. Code § 1710(2) by asserting that their payroll and tax services did not have any hidden fees and were performed in a manner most beneficial to the Company-Client, when Paychex had no reasonable grounds for believing it to be true.

84. Paychex has violated and continues to violate Civ. Code § 1710(3) by suppressing the fact that their payroll and tax services contained hidden fees and were not performed in a manner most beneficial to the Company-Client.

85. Paychex has violated and continues to violate Civ. Code § 1710(4) by promising that their payroll and tax services do not contain hidden fees and are performed in a manner most beneficial to the Company-Client, when in fact Paychex had no intention of performing on this promise.

86. Plaintiff and members of the Class were harmed by Paychex's allegations regarding their payroll and tax services because they would not have enrolled these services had they known they were offered under false pretenses and were rigged to the benefit of the Defendant.

87. Pursuant to Cal. Civ. Code § 1709, Paychex is liable for any damages which was proximately caused to Plaintiff and members of the Class by Paychex's deceit.

**COUNT 7—VIOLATIONS OF CAL. CIVIL CODE § 1572**

88. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89. Cal. Civ. Code § 1572 provides in relevant part that "[a]ctual fraud . . . consists in any of the following acts, committed by a party to the contract, or with his


EXHIBIT C

EXHIBIT C

connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

(3) the suppression of that which is true, by one having knowledge or belief of the fact;

(4) A promise made without any intention of performing it; or,

(5) any other act fitted to deceive."

90. Paychex has violated and continues to violate Civ. Code § 1572(1) by suggesting that their payroll and tax services did not contain hidden fees and were performed in a manner most beneficial to the Company-Client, which Paychex did not believe to be true.

91. Paychex has violated and continues to violate Civ. Code § 1572(2) by asserting that their payroll and tax services did not contain hidden fees and were performed in a manner most beneficial to the Company-Client. In fact, these assertions were false and known by Paychex to be false.

92. Paychex has violated and continues to violate Civ. Code § 1572(3) by suppressing the fact that their payroll and tax services do have hidden fees and that that their services are not performed in a manner most beneficial to the Company-Client.

93. Paychex has violated and continues to violate Civ. Code § 1572(4) by promising that their payroll and tax services do not contain hidden fees and that their services are performed in a manner most beneficial to the Company-Client, when in fact they had no intention of performing on the promise.

94. Paychex has violated and continues to violate Civ. Code § 1572(5) by making false misrepresentations which were intended to lure their customers into

EXHIBIT C

EXHIBIT C

enrolling their services which contained hidden fees, were not performed in a manner most beneficial to the Company-Client, and were in fact extremely fraudulent.

95. As a direct and proximate result of Paychex's fraud, Plaintiff and the members of the Class have and will continue to suffer damages.

96. Plaintiff seeks damages against Paychex including but not limited to disgorgement of all proceeds Paychex obtained from the contracts entered into with Plaintiff and the members of the Class as well as pre-judgement interests and costs.

**COUNT 8—VIOLATIONS OF CAL. CIVIL CODE § 1573**

97. Plaintiff repeats and reallages the allegations contained in paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98. Plaintiff brings this claim individually and on behalf of the Class against Paychex.

99. Cal. Civ. Code § 1573(1) provides in relevant part that "[c]onstructive fraud consists . . . [i]n any breach of duty which, without an actually fraudulent intent, gains an advantage . . . by misleading another to his prejudice . . . . "

100. Paychex has violated and continues to violate Civ. Code § 1573(1) by misleading Plaintiff and the members of the Class to believe that their payroll and tax services did not contain hidden fees and were performed in a manner most beneficial to the Company-Client. These actions constituted constructive fraud because they gave Paychex an unfair advantage, achieved by unfair means, over Plaintiff and the members of the Class.

101. Plaintiff seeks damages against Paychex, including but not limited to disgorgement of all proceeds Paychex obtained from their unlawful business practices as well as pre-judgment interests and costs.

**COUNT 9—BREACH OF FIDUCIARY DUTY**

102. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 101 of the Complaint as if fully set forth herein.

EXHIBIT C

EXHIBIT C

103. A fiduciary relationship existed between Plaintiff and Paychex whereby Plaintiff, with justification, placed trust and confidence in the integrity and fidelity of another. Plaintiff trusted Paychex with substantial amounts of highly sensitive information: employer and employee confidential information, including, but not limited to, bank account, social security, and tax identification numbers.

104. Plaintiff further trusted Paychex to safeguard its assets in connection with withdrawals necessary for tax payment purposes and for making the necessary, and only the necessary, withdrawals to effectuate Plaintiff's payroll obligations.

105. Paychex had access to Plaintiff's business structure, financial data, the amount of each employee's remuneration, employees' names, addresses, bank accounts, etc. This is all information which is considered extremely sensitive and can create numerous problems for Plaintiff's business if it became public. As an administrator of the Plaintiff's payroll and as an actor on their behalf, Paychex owed fiduciary duties to its customers and their employees to act in good faith, to safeguard the information it acquired and to not abuse this privilege.

106. By misusing the customers' bank accounts and accessing them without authorization, and by retaining customer assets, Paychex breached its fiduciary duty to Plaintiff. Further, by placing "hidden" charges and overcharging its customers, the Company abused Plaintiff's trust and acted in bad faith which also constituted a breached its fiduciary duty.

107. There is no suitable justification for any of Paychex's behavior: although Paychex was entitled to assess fees and withdraw money to pay Plaintiff's taxes, there is no explanation for Paychex's conscious decision to do so in a fraudulent and misleading manner.

108. Plaintiff and Class Members seek damages from Paychex including but not limited to disgorgement of all proceeds Paychex obtained from breaching its fiduciary duty to Plaintiff and the members of the Class as well as pre-judgment interests and costs.

EXHIBIT C

COUNT 10 – CONVERSION

109. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 of the Complaint as if fully set forth herein.

110. Paychex converted Plaintiff's money when it overcharged it and withdrew funds from its bank accounts prolonging the return of the funds and accumulating interest.

111. Paychex was clearly not entitled to charge Plaintiff fees which were not disclosed in the customer contracts. Further, Paychex had limited authorization to withdraw money from Plaintiff and immediately transfer it to employees or to others, as necessary; its role was to be an intermediary, not a bank. Instead, the Company would withdraw money, seemingly to pay salaries, and would withhold it for arbitrary period, rather than immediately debit employees' bank accounts. Customers or employees could only discover the delay if they closely examined their bank statements. When that happened, Paychex's customer representatives would delay returning the money and would not admit to any wrongdoing.

112. Moreover, the sums that Paychex converted are of particular and definite amount which is easily traceable because any transactions that Paychex did are reflected in Plaintiff's bank statements. Accordingly, Paychex wrongfully overcharged Plaintiff and withheld assets for extended periods of time retaining interest that did not belonged to them.

113. Plaintiff and Class Members seek damages from Paychex including but not limited to disgorgement of all proceeds Paychex obtained from unauthorized withdrawals and the interest earned thereof, as well as pre-judgment interests and costs.

COUNT 11 – BREACH OF CONTRACT

114. Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 113 of the Complaint as if fully set forth herein.

115. Plaintiff contracted with Paychex to receive certain payroll services in exchange of agreed upon fees.

EXHIBIT C

116. Paychex, however, consistently sneaked in unexplained "phantom" charges—fees which were not agreed to or disclosed—in Plaintiff's bills from Paychex.

117. Plaintiff fully and faithfully performed its obligations under the contract by paying all agreed upon fees in a timely manner.

118. By overcharging Plaintiff and with fees that were not in the contract and not notifying it of the extra charges, Paychex breached its contract with Plaintiff. This is not to say that each and every charge should have been anticipated and included in the contract. However, Paychex did not even attempt to notify Plaintiff of these charges if they were in fact unanticipated, not to mention seek its approval of them.

119. Paychex acted in bad faith and damaged Plaintiff by sneaking in "hidden" fees. Besides the tangible financial damage that Plaintiff suffered because of decreased operational assets, Plaintiff also suffered from loss of future profits in expanding its business or improving its services. Plaintiff also suffered reputational and emotional damages because its bank account could not cover checks which Paychex drew. This not only made it a risky customer but also damaged its reputation as a trustworthy business partner.

120. Because Paychex failed to adhere to the terms of its customer contracts, Plaintiff suffered extensive financial and reputational damages.

121. Plaintiff and Class Members seek damages from Paychex including but not limited to disgorgement of all proceeds Paychex obtained from the contracts entered into with Plaintiff and the members of the Class as well as pre-judgment interests and costs.

EXHIBIT C

EXHIBIT C

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant as follows:

(a) an order certifying the Class, and appointing Plaintiff and its undersigned counsel of record to represent the Class;

(b) a permanent injunction enjoining Defendant, its partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with it directly or indirectly, or in any manner, form in any way engaging in the practices set forth herein, including any elements of the Skimming Fraud;

(c) a permanent injunction enjoining Defendant, its partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with it directly or indirectly, or in any manner, form utilizing any monies acquired by Defendant's unfair business practices, including all profits, revenues, and proceeds both direct and indirect;

(d) imposition of a constructive trust upon all monies and assets Defendant has acquired as a result of its unfair practices;

(e) compensatory damages and full restitution of all funds acquired from Defendant's unfair business practices, including disgorgement of profits;

(f) actual damages suffered by Plaintiff and Class members;

(g) punitive damages, to be awarded to Plaintiff and each Class member;

(h) costs of suit herein;

(i) investigated costs;

(j) both pre- and post-judgment interest on any amounts awarded;

(k) payment of reasonable attorneys' fees; and

(l) such other and further relief as the Court may deem just and proper.

///

///

///

EXHIBIT C

EXHIBIT C

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: Los Angeles, California
October 16, 2008

Respectfully submitted,

Lisa L. Maki
Christina M. Coleman
**LAW OFFICES OF LISA L. MAKI**
1111 South Grand Avenue, Suite 101
Los Angeles, CA 90015
Telephone: (213) 745-9511
Facsimile: (213) 745-9611
*Liaison Counsel for Plaintiff and the Class*

Yasmeen Allen
Craig Stuart Lanza
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2900
New York, NY 10007
Telephone: (212) 374-5404
Facsimile: (212) 208-2613
*Attorneys for Plaintiff and the Class*

EXHIBIT C

EXHIBIT D

2 0 0 8

# ACH RULES

## A Complete GuideTo Rules & Regulations Governing the ACH Network

Copyright 2008 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
13450 Sunrise Valley Drive, Ste 100
Herndon VA 20171
703-561-1100
www.nacha.org
www.electronicpayments.org

EXHIBIT D

EXHIBIT D

**SECTION 1.7 Records**

SUBSECTION 1.7.1 Records of Entries

Each Participating DFI must retain records of all entries, including return and adjustment entries, transmitted from or to an ACH Operator. These records must be retained for six years from the date the entry was transmitted. The Participating DFI must, if requested by its customer, or any other Participating DFI or ACH Operator which originated, transmitted, or received the entry, provide the requester with a printout or reproduction of the information relating to the entry. A Participating DFI may impose a reasonable charge for the provision of such information.

SUBSECTION 1.7.2 Record Retention

Any agreement, authorization, written statement under penalty of perjury, or other record required by these rules may be retained as an electronic record that (1) accurately reflects the information in the record, and (2) is capable of being accurately reproduced for later reference, whether by transmission, printing, or otherwise.

SUBSECTION 1.7.3 Electronic Records Permitted

Any agreement, authorization, written statement under penalty of perjury, or other record required by these rules to be in writing may instead be in electronic form. Any record that is required to be signed or similarly authenticated may be signed with an electronic signature in conformity with the terms of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. §7001, et seq.) and in a manner that evidences the identity of the person who signed and that person's assent to the terms of the record. Any record that is signed or similarly authenticated according to the terms of an applicable state version of the Uniform Electronic Transaction Act is deemed to be signed in conformity with the terms of the Electronic Signatures in Global and National Commerce Act.

**SECTION 1.8 Choice of Law**

These rules and the rights and obligations of a party with regard to a credit entry subject to Article 4A shall be construed in accordance with and governed by the laws of the State of New York, unless otherwise provided in an agreement of such party.

# ARTICLE TWO — ORIGINATION OF ENTRIES

**SECTION 2.1 Prerequisites to Origination**

The following must occur before an Originator may initiate the first credit or debit entry to a Receiver or to a Receiver's account with an RDFI:

SUBSECTION 2.1.1 Originator Authorization and Agreement

The Originator or a Third-Party Sender has authorized the ODFI to transmit, and to credit or debit the amount of, one or more entries to the Receiver's account. For all entries except CIE, either (1) the Originator and ODFI have entered into an agreement under which the Originator agrees to be bound by these rules as in effect from time to time and acknowledges that entries may not be initiated that violate the laws of the United States, or (2) any Third-Party Sender has entered into an appropriate agreement under which the Third-Party Sender is bound by these rules as in effect from time to time and acknowledges that entries may not be initiated that violate the laws of the United States, and the Originator has entered into an appropriate agreement under which the Originator has assumed the responsibilities of an Originator under these rules and has acknowledged that entries may not be initiated that violate the laws of the United States. Each Third-Party Sender is subject to the requirements of Article Five (Obligations of Third-Party Senders). This subsection does not apply to XCK entries initiated pursuant to section 2.7 (Destroyed Check Entries).

SUBSECTION 2.1.2 Receiver Authorization and Agreement

The Receiver has authorized the Originator to initiate the entry to the Receiver's account. In the case of CBR, CCD, and CTX entries, the Receiver has an agreement with the Originator under which the Receiver has agreed to be bound by these rules as in effect from time to time.

In the case of credit entries to a Consumer Account, the authorization may be provided orally or by other non-written means. Except as noted later in this subsection 2.1.2, in the case of debit entries to a Consumer Account, the authorization must be in writing and signed or similarly authenticated by the consumer. The similarly authenticated standard permits signed, written authorizations to be provided electronically, and the authorization process must evidence both the consumer's identity and his assent to the authorization.

With respect to the use of electronic authorizations, an electronic authorization must be able to be displayed on a computer screen or other visual display that enables

EXHIBIT D

EXHIBIT D

the consumer to read the communication. The writing and signature requirements are satisfied by compliance with the Electronic Signatures in Global and National Commerce Act (15 U.S.C. §7001 et seq.), which defines electronic records (as contracts or other records created, generated, sent, communicated, received, or stored by electronic means) and electronic signatures. Electronic signatures include, but are not limited to, digital signatures and security codes.

The authorization must be readily identifiable as an authorization, must clearly and conspicuously state its terms, and, for all entries except POP entries and Single-Entry WEB entries, the authorization must provide that the Receiver may revoke the authorization only by notifying the Originator in the manner specified in the authorization.

The authorization for POP entries consists of a written authorization in accordance with the requirements of this subsection 2.1.2 and a notice meeting the requirements of subsection 2.1.6 (Notification for Point-of-Purchase Entries). The authorization for ARC Entries consists of a notice meeting the requirements of subsection 2.1.4 (Notification for Accounts Receivable Entries) and the receipt of the Receiver's source document. The authorization for BOC Entries consists of a notice meeting the requirements of subsection 2.1.5 (Notification for Back Office Conversion Entries) and the receipt of the Receiver's source document. The authorization for RCK entries consists of a notice meeting the requirements of subsection 2.1.7 (Notification for Re-presented Check Entries) and the receipt of the item to which the RCK entry relates.

Entries subject to subsections 2.1.3 (Exception to Authorization Requirement) and 2.1.8 (Authorization for Telephone-Initiated Entries) are excepted from these Receiver authorization requirements.

SUBSECTION 2.1.3 Exception to Authorization Requirement

If both the Originator and Receiver are natural persons, no authorization by the Receiver is required for credit entries, and no warranty with respect to that authorization is made by the ODFI. No authorization by the Receiver is required for entries initiated pursuant to section 2.7 (Destroyed Check Entries). The provisions of section 3.5 (Consumer Accounts - Copy of Debit Authorization), section 3.13 (Record of Authorization), and subsection 4.1.1 (Right to Information Regarding Entries) are not applicable to the entries described in this subsection 2.1.3.

SUBSECTION 2.1.4 Notification for Accounts Receivable Entries

Prior to the receipt of each source document that is used as the basis for the origination of an ARC entry, the Originator must provide the Receiver with notice that includes the following, or substantially similar, language:

"When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction."

The notice must be provided to the Receiver in a clear and conspicuous manner.

Until January 1, 2010, the notice must also include the following, or substantially similar, additional language:

> "When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution."

If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

SUBSECTION 2.1.5 Notification for Back Office Conversion Entries

Prior to the receipt of each source document that is used as the basis for the origination of a BOC entry, the Originator must provide the Receiver with notice that includes the following, or substantially similar, language:

> "When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. For inquiries, please call <retailer phone number>."

The notice must be posted in a prominent and conspicuous location and a copy of such notice, or language that is substantially similar, must be provided to the Receiver at the time of the transaction.

Until January 1, 2010, the posted notice must also include the following, or substantially similar, additional language, although such language need not be included on the copy provided to the Receiver:

> "When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day you make your payment, and you will not receive your check back from your financial institution.

EXHIBIT D