# Exhibit A

**Step 1: Read and complete this form**

Company Name: RICHARD BERGIN

# Paychex Services Agreement

Office/Client Number: 00811____

Federal ID Number: 954790802

___ (INITIALS) **Taxpay® (includes SUI Support Service)**
Client hereby employs and authorizes Paychex, on or before Client's check date, to: (1) process EFT transactions, or such other payment methods as Paychex may require, for such amounts as are necessary to pay to proper taxing authorities the payroll taxes which are specifically identified on the *Cash Requirements and Deposits Report*. Such amounts are to be held in separate accounts established by Paychex until such time as these amounts are due to the appropriate taxing authorities; and (2) prepare, sign, and file with proper taxing authorities all returns for such taxes on an ongoing basis. **Paychex is not responsible for the payment of taxes or the filing of returns prior to the Implementation Date or for payroll taxes which Paychex did not collect from Client.** SUI Support Service: Client hereby employs and authorizes Paychex to provide Client with telephone assistance related to the following unemployment insurance matters: pre-separation of employees, unemployment claims, pre-hearing preparation, voluntary contributions, tax rate questions, and benefit charge statements.

___ (INITIALS) **Taxpay® (without SUI Support Service)**
Client hereby employs and authorizes Paychex, on or before Client's check date, to: (1) process EFT transactions, or such other payment methods as Paychex may require, for such amounts as are necessary to pay to proper taxing authorities the payroll taxes which are specifically identified on the *Cash Requirements and Deposits Report*. Such amounts are to be held in separate accounts established by Paychex until such time as these amounts are due to the appropriate taxing authorities; and (2) prepare, sign, and file with proper taxing authorities all returns for such taxes on an ongoing basis. **Paychex is not responsible for the payment of taxes or the filing of returns prior to the Implementation Date or for payroll taxes which Paychex did not collect from Client.**

___ (INITIALS) **State Unemployment Insurance Service (SUIS)**
Client hereby employs and authorizes Paychex to provide Client with the following administrative services relating to unemployment insurance: claim and appeal processing, pre-hearing preparation, analytical review of voluntary contributions, and charge statement balancing. Client agrees to complete and forward applicable Power of Attorney and Record of Address forms to Paychex. **This service replaces the SUI Support Service described in the above Taxpay® (includes SUI Support Service) section. Additional fees will apply.**

___ (INITIALS) **Business Tax Service (BTS)**
Client hereby employs and authorizes Paychex to send instructions to the IRS to initiate an EFT debit to Client's bank account for federal tax amounts specified by Client. Client agrees to provide Paychex all information necessary to perform BTS, including the amounts to be debited and federal tax type, no later than noon Eastern Time (ET), at least two (2) business days prior to the tax payment due date. Failure to provide the necessary information in a timely manner may result in the delayed payment of federal taxes by Client. **This service does not include the preparation or filing of tax returns.**

___ (INITIALS) **Premium Only Plan (POP)**
Client hereby employs and authorizes Paychex to act as Plan Service Provider for Client's Premium Only Plan. Paychex agrees to prepare the Plan Document/Adoption Agreement, prepare the Summary Plan Description, and perform compliance testing.

___ (INITIALS) **Direct Deposit/Access Card**
Client hereby employs and authorizes Paychex to process EFT transactions, or such other payment methods as Paychex may require, one or more banking days prior to Client's check date, for such amounts as are necessary to pay Client's employees. Such amounts are to be held in an account established by Paychex until Client's check date, when funds shall be deposited to employee accounts as specified.

___ (INITIALS) **Readychex®**
Client hereby employs and authorizes Paychex to process EFT transactions, or such other payment methods as Paychex may require, one or more banking days prior to Client's check date, for such amounts as are necessary to pay Client's employees. Such amounts are to be held in an account established by Paychex until Client's check date, when Paychex shall draw checks thereon payable to Client's employees and shall provide those checks to Client. Client agrees to distribute Readychex checks on check date or thereafter. Readychex checks distributed to employees before check date will not be honored. In the event the checks are not honored, it is Client's responsibility to pay the employees.

___ (INITIALS) **Check Signing**
Client hereby employs and authorizes Paychex to use Client's signature to create a computer-generated facsimile that will display on each of Client's payroll checks each payday.

___ (INITIALS) **Check Insertion**
Client hereby employs and authorizes Paychex to insert Client's signed checks into individual employee envelopes that will be sealed and returned to Client.

___ (INITIALS) **Logo Service**
Client hereby employs and authorizes Paychex to use Client's logo to create a computer-generated facsimile that will display on each of Client's payroll checks. Client warrants and represents to Paychex that Client is the owner of said logo, has full right and authority to use it on its payroll checks, and that such use does not violate any other party's rights.

___ (INITIALS) **Garnishment Payment Service**
Client hereby employs and authorizes Paychex to process EFT transactions, one banking day prior to Client's check date, for Client's employees' garnished wages as are necessary to remit to the appropriate entities. Client agrees to provide Paychex with a garnishment order for each employee for whom wages are to be garnished. Such amounts are to be held in a separate account established by Paychex until such time as these amounts are due. Paychex shall assist Client in calculating the amount to garnish, but Client remains solely responsible for the correct calculation of the amount to garnish from its employees' wages.

Client acknowledges and understands that Paychex will not commence any of the Services requested until Paychex receives all documents necessary to begin each of the Services and notifies Client of the date Paychex will commence each of the Services ("Implementation Date"). Client understands that this Agreement may be considered an application for credit and hereby authorizes Paychex to investigate the credit of the Client and/or its principals, including vendor references, bank account status, and history (collectively "Client's Credit"). Paychex' performance of the Services under this Agreement is subject to approval of Client's Credit. Client warrants that it possesses full power and authority to enter into this Agreement, that it has chosen the Services initialed, and has read and agrees to the terms and conditions listed above and on the reverse side of this page.

Authorized Officer's Name: RICHARD BERGIN (PRINT)

Authorized Officer's Signature: _____

Title: OWNER

Date: 11/10/04

Sign Here!



EAGR0397

Rev. 6/04

1. **Term of Agreement.** Paychex shall not be obligated to commence any service initiated by Client on the preceding page ("Services") until Paychex notifies Client of the Implementation Date. Paychex may commence performance for one or more Services without obligating itself to commence all Services selected by Client. The Agreement shall continue until terminated by Client or by Paychex in accordance with the provisions contained herein. **Until the Implementation Date, Client shall continue to provide for itself the Services requested of Paychex. Paychex assumes no responsibility for services prior to the Implementation Date for each of the Services.**

2. **Services to be Performed.** Client hereby employs Paychex to provide the Services, and Client acknowledges that each of the Services is a separate service, and that each of the Services may have different Implementation Dates. **Client acknowledges and agrees that Paychex is not rendering legal, tax, accounting, or investment advice in connection with the Services to be performed.**

3. **Payment of Fees and Remittance for Services.** Client hereby agrees to pay the fees for services and remit funds representing the amount due to pay Client's employees, remit taxes, or pay garnishments (collectively "Amounts Due") through an Electronic Funds Transfer (EFT), or such other payment method as required by Paychex. In the event that EFTs are used for Amounts Due, Paychex is hereby authorized to collect all Amounts Due from Client's bank account when due. Client agrees that the funds representing the Amounts Due must be on deposit in Client's bank account in collectible form and in sufficient amount on the day Paychex' EFT is presented. If sufficient funds are not available, Paychex may take such action to collect Amounts Due, including, but not limited to, reissuance of the EFT. If Paychex requires payment via wire transfer or other method, Client agrees to provide Paychex with all information necessary to confirm receipt of the payment, including, but not limited to, financial institution information and confirmation numbers. Paychex' fees are subject to change at any time with written notification to Client. Paychex may, in its sole discretion, require a security deposit from Client, and Client hereby waives any right to interest that may accrue on said security deposit. **If Paychex is unable to confirm receipt of funds by EFT, wire transfer, or other method prior to the funding deadline, remittance of wages, garnishments, and taxes may be delayed.**

4. **Electronic Funds Transfers.** All EFTs are performed in compliance with the National Automated Clearing House Association operating rules ("NACHA"). Client agrees to follow and be bound by NACHA as they are amended from time to time and assumes the responsibilities of an initiator of EFTs. Client agrees that it will not initiate or ask Paychex to process an EFT that violates any law. Client agrees that Paychex may provide information necessary to identify Client to banks involved in the EFT.

5. **Client's Responsibility.** As a condition precedent for Paychex' performance of the Services, Client agrees to:

   A. execute all documentation needed by Paychex to originate EFT transactions and to verify availability of funds in Client's bank account;

   B. execute and/or provide any other documents which Paychex requires to perform its responsibilities under the Agreement, up to and including, where applicable, taking all necessary corporate action;

   C. review for accuracy all reports, documents, and payments produced by Paychex and forwarded to Client; and to inform Paychex of any inaccuracies therein within three (3) business days of receipt;

   D. have available in Client's bank account sufficient funds in collectible form to cover EFT transactions, or, at Paychex' sole option, to make payment by wire transfer, or such other payment method as required by Paychex, prior to the funding deadline;

   E. provide Paychex promptly with all necessary information, including any changes thereto, pertaining to Client's employees; and to comply with any and all applicable federal, state, or local laws or ordinances; and

   F. provide Paychex with payroll information at least two banking days prior to payroll check date. Failure to provide payroll information in a timely manner may result in the delayed remittance of wages, taxes, and garnishments and may result in an additional processing fee.

6. **Client's Default.** Client shall be deemed in default of the Agreement in the event it fails to comply with its responsibilities as outlined in Sections 3-5. In the event of a Client Default, Paychex may, at its sole option, terminate the Agreement without notice and declare all amounts owed by Client to Paychex immediately due and payable. Client agrees to promptly reimburse Paychex for all advances made by Paychex and to pay interest on the advances at the rate of one and one-half percent (1½%) per month, or the maximum allowable by applicable law, until paid. Client agrees that Paychex may initiate an EFT to (i) Client's bank account for any past due Amounts Due and/or (ii) Client's employees' bank accounts for any past due amounts advanced to Client's employees. Client shall be responsible for the costs of collection of past due amounts, including, but not limited to, attorneys' fees (including in-house counsel) and court and arbitration costs.

7. **Refund/Adjustments.** Paychex will not process any Client request for refunds or adjustments until Paychex receives verification that all outstanding fees, payments, and balances due to Paychex have been paid. Client agrees that Paychex may apply any balances it is holding for Client to outstanding balances due to Paychex prior to refunding amounts to Client.

8. **Termination.** Except as otherwise provided, Client may terminate the Agreement upon thirty (30) days prior written notice. Paychex may immediately terminate the Agreement upon written notice for any reason, including, but not limited to, the following events: (i) Client becomes subject to receivership, bankruptcy, or is insolvent; (ii) Paychex, in its sole discretion, determines that a material adverse change has occurred in the financial condition of Client; or (iii) Paychex determines, in its sole discretion, that any federal, state, or local legislation, regulatory action, or judicial decision adversely affects its interests under the Agreement. Termination of the Agreement shall not relieve Client of any obligations set forth herein, including, but not limited to, its payment obligations.

9. **Limit of Liability.** Paychex shall not be held liable for (i) any negligent act or omission by Paychex; (ii) the negligence of any other person or entity, including, but not limited to, Client and its employees or agents, or any person or entity which provides services in connection with or as a result of Paychex' performance of its obligations under the Agreement; (iii) any loss, claim, or expense arising from any information provided or modified by Client; or (iv) Client's breach of NACHA. Paychex' sole liability and Client's sole remedy for Paychex' breach of the Agreement shall be: (i) for Paychex to remit to the appropriate Payee the funds received from Client; and/or (ii) for Paychex to reimburse Client or its employees for any interest or penalties assessed as a direct result of Paychex' breach of the Agreement. **Paychex shall, under no circumstances, be liable for any special, indirect, incidental, or consequential damages which Client may incur as a result of Paychex' breach of the Agreement, or as a result of Paychex' exercise of its rights under the Agreement, even if Paychex has been advised of the possibility of such damages.**

10. **Indemnification.** Client shall indemnify, defend, and hold Paychex harmless from any and all claims, actions, liabilities, losses, EFT reissuance charges, costs, attorneys' fees (including in-house counsel fees), and expenses resulting from or arising in connection with (i) a Client Default; (ii) the use, misuse, reproduction, modification, or unauthorized distribution of Software; (iii) Client's breach of NACHA; or (iv) Client's breach of any warranty set forth in the Agreement.

11. **Governing Law and Arbitration.** The Agreement shall be governed by the laws of the State of New York. Except as provided herein, any dispute arising out of, or in connection with, the Agreement shall be determined by binding arbitration in Rochester, New York, in accordance with the commercial rules of the American Arbitration Association. Any dispute arising out of, or in connection with, any other agreement between the parties may be consolidated into the same arbitration proceeding upon agreement of the parties. Any dispute arising under the Agreement shall be brought within two (2) years of when the claim accrued. The arbitrator shall not be authorized to award exemplary or punitive damages. Paychex may, in its sole discretion, commence an action in any court of competent jurisdiction within the County of Monroe, State of New York, for any monies due and owing from Client to Paychex. Client hereby waives any jurisdictional defenses and submits to the exclusive jurisdiction of the New York courts. The parties agree that the prevailing party in arbitration, and any subsequent judicial proceeding to enforce an arbitration award, shall be awarded costs and attorneys' fees (including in-house counsel fees) and that an arbitration award may be entered as a judgment in any court having jurisdiction over either party to the Agreement.

12. **Assignability.** The Agreement may not be assigned by Client to any third parties, other than successors, without the prior written consent of Paychex. Any assignment made without such consent shall be null and void.

13. **Software Licenses.** Client has received, or may receive, certain computer software relating to Services selected by Client ("Software"). Client agrees and acknowledges that it hereby accepts all of the terms and conditions of any and all Paychex Software, and/or third-party Software, and any and all applicable license agreements provided to Client now or in the future.

14. **Miscellaneous.** The Agreement contains the entire understanding of the parties. Neither party shall be responsible for any delay or failure to perform obligations specified in the Agreement due to causes beyond the party's reasonable control, including, but not limited to, acts of God, war, terrorism, labor disputes, or acts of any governmental body. Client acknowledges that there have been no representations or warranties made by Paychex or Client which are not set forth in the Agreement. Paychex may modify any term of the Agreement by written notice to Client of such change and the effective date thereof. Client shall be deemed to have accepted and agreed to such changes unless Client elects to terminate the Agreement by written notice to Paychex prior to the effective date of the change. If any provision of the Agreement or any portion thereof shall be held to be invalid, illegal, or unenforceable, the validity, legality, or enforceability of the remainder of the Agreement shall not in any way be affected or impaired. Sections 3-14 shall survive the termination of the Agreement.

# Exhibit B



BALESTRIERE FARIELLO
225 Broadway, Suite 2900
New York, NY 10007
Phone: +1.212.374.5400
Fax:    +1.212.208.2613
info@balestriere.net
www.balestriere.net

## FIRM BIOGRAPHY

1. Attorney **John Balestriere** tries cases and argues appeals. He has handled street crime, white collar crime, organized crime, fraud, business tort, class action, civil rights, qui tam, defamation, and a variety of other matters across the country. Mr. Balestriere is a graduate of Monsignor Farrell High School, Columbia College, and the Yale Law School.

   Mr. Balestriere represents individual and company clients in criminal and regulatory matters and all stages of complex civil litigation, including depositions, trials, and appeals in federal and state courts. He also represents clients in intense negotiations and arbitrations, and directs internal investigations into alleged misconduct at companies, institutions, and government entities.

   Mr. Balestriere has seven years of law enforcement experience in both Eliot Spitzer's State Attorney General's Office and Robert Morgenthau's Manhattan District Attorney's Office. He first worked for Mr. Morgenthau after college as an analyst in the Rackets Bureau, assisting attorneys in investigations into judicial and political corruption, Cosa Nostra organized crime groups, major narcotics distribution gangs, and identity theft. After law school, Mr. Balestriere served in that same office as an Assistant District Attorney in the Trial Division, trying a significant number of cases to juries, and handling cases from the lowest level misdemeanors to the highest level felonies. While there he also specialized in Domestic Violence and Sex Crimes prosecution, and conducted investigations into bribery of government officials, organized employee theft schemes, and credit card fraud.

   Mr. Balestriere was recruited from the District Attorney's Office to work in a newly created investigative unit in the New York State Attorney General's Office. In that specialized unit he directed teams of former police detective investigators, financial auditors, and investigative analysts into long term investigations of organized crime, insurance fraud, human trafficking, and large identity theft rings. Such investigations led to the arrest and indictment of dozens of individuals, including entire gangs who, working with doctors, lawyers, and other professionals, perpetrated large auto insurance fraud schemes throughout the New York City area. Mr. Balestriere also devised a unit-wide intelligence system that allowed varied investigators and attorneys to pool their resources and more intelligently conduct investigations into a variety of frauds.

   After work as a criminal prosecutor and investigator, Mr. Balestriere joined a small class action firm where he prosecuted securities, antitrust, and consumer fraud cases against the largest banks and public companies in the world.

   Mr. Balestriere has been quoted in media in the United States and abroad, from The New York Times, to CBS Morning News, to the Birmingham Post-Herald, to ABC News, to RAI television, the official broadcasting channel of the Italian government. He



has commented on a range of topics including attorneys sharing risk with their clients in litigation, ongoing criminal trials, pending civil actions, recently passed legislation, major fraud investigations, and the emerging use of the class action device in foreign countries.

Mr. Balestriere is admitted to practice law in New York State, as well as to the bars of the United States Supreme Court, the Court of Appeals for the Second Circuit, the United States Court of International Trade, and the Southern and Eastern District Courts of New York.

2. **Attorney Geisa Balla** was born and raised in Peshkopi, Albania until she moved to the United States with her family in 1996.

She graduated from Michigan State University with a B.A. in International Studies. There, she was active with the International Relations Organization, the Lansing Refugee Center, and the East Lansing Film Festival.

After college, Ms. Balla headed to New York Law School, where she served on the Board of Directors and represented claimants in unemployment disputes for the Unemployment Action Center. She also served as Vice President and Outreach Chair for New York Law School's Lawyers Without Borders chapter. In addition, she interned at the Counsel's Office for Brooklyn Borough President Marty Markowitz, where she researched, mediated, and prepared speeches on constituent concerns such as affordable housing, property and insurance laws.

Ms. Balla first arrived at Balestriere Fariello as an apprentice during her last year of law school, where she researched and prepared legal documents on procedural and legal issues for lawsuits on defamation, breach of contract, criminal appeal and Title VII age discrimination.

She has passed both the New Jersey and New York State Bar Exams and is currently awaiting admission in both state Bars.

4. **Attorney Brandon Page** was born and raised in St. Paul, Minnesota. In 2005, he graduated Phi Beta Kappa from the University of Minnesota with a B.A. in Psychology. He went on to the University of Minnesota Law School where he graduated *cum laude* with a concentration in Business Law.

Mr. Page's previous experience covers corporate transactional matters and investment banking. His recent matters include class actions, complex commercial litigation and other various contractual disputes.

Mr. Page is admitted to practice before the courts of the State of New York

5. **Analyst Jessica Acosta** is a native of Queens, New York. She received her B.A. *cum laude* from Harvard University in Romance Languages and Literatures with a concentration in Latin American Studies. While at Harvard, Ms. Acosta was president of the largest Latino/Latin American student group and was an ESL Peer Consultant at the Harvard Bureau of Study Counsel. She also studied Portuguese in Rio de Janeiro



and was a public policy intern in Sao Paulo, Brazil.  Ms. Acosta has recently worked on a matter in which a large international bank prevented a small commodity trading company from performing its obligations to a third party seller, and a class action against an online auction arena.

6. **Analyst SaraAnn Bennett** was born in New Jersey and grew up in Tennessee and Ohio.  She graduated from Columbia College with a Bachelor of Arts in Political Science with a focus in American Politics.  While at Columbia, Ms. Bennett played for the Varsity women's soccer team, was a member of the Kappa Alpha Theta sorority, and interned at the firm during her senior year.  Recently, she has worked on matters where an attorney has sued his former colleagues after being denied his fair share of fees, and a consumer fraud class action against a major financial institution.

7. **Analyst Sarah Goodman** was born and raised in Philadelphia, Pennsylvania.  She received her B.A. from Brown University with a degree in Urban Studies.  At Brown, she was a four-year varsity letter winner on the swimming & diving team.  She was elected captain during her senior season and was named as an All-Ivy selection during her freshman season.  Ms. Goodman has previous experience working with public interest law firms in Philadelphia.  Her recent work includes a class action against a telecommunications and Internet company and FINRA arbitration against a major international bank.

8. **Analyst Adam Goodrum** was born and raised in West Texas. He attended Yale University, receiving his B.A. in Political Science with a focus in American politics and education.  Mr. Goodrum has been active in politics at the local, state, and national levels; at one point serving as a political advisor to a member of the Texas House of Representatives.  His recent work includes a case against an insurance company accused of defrauding New York City out millions of dollars and a consumer fraud class action against a leading travel services-related website.

9. **Analyst Laura Sayler** is a native of New Canaan, Connecticut.  She received her A.B. from Dartmouth College in Latin American Studies with a concentration in Indigenous Peoples of the Americas. Pursuing her interest in Latin America as an undergraduate, she studied abroad in Buenos Aires, Argentina, and directed a service trip to Nicaragua.  Ms. Sayler has interned with the Legal Aid Society's Manhattan Housing Court Project, a corporate law firm in Connecticut, and worked as a research assistant for a Dartmouth professor in preparation for a book on Federal Indian Law.  Her recent matters include a long running financial services antitrust matter, and a class action on behalf of companies against a payroll services provider.

# Exhibit C

# BALESTRIERE FARIELLO
# CLASS ACTION MATTERS

Attorneys at Balestriere Fariello have prosecuted the following class action matters, either at Balestriere Fariello or previously at other law firms:

1. Cutler v. Nat'l Ass'n of Sec. Dealers, Inc., 06-CV-01322, (JDB)(D.C.D.C.)

2. Crete v. Resort Condominiums International, LLC, 09-CV-02080, (DRD)(MAS)(D.N.J.)

3. DeMarco v. Lehman Brothers, Inc., 03-CV-03470, (JSR)(S.D.N.Y.)

4. DeMarco v. Robertson Stephen, Inc. et al, 03-CV-00540, (GEL)(S.D.N.Y.)

5. Dr. Christine Nayal et al v. HIP Networks Services IPA, Inc., 08-CIV-10170, (VM)(S.D.N.Y.)

6. Eaves v. Designs for Finance, Inc. et al, 09-CV-03952, (CS)(S.D.N.Y.)

7. In re 168 William Street Partnership, 03-CV-04979, (FB)(VVP)(E.D.N.Y.)

8. In re Arrow Linen Supply Co., Inc. et al, 03-CV-04331, (FB)(VVP)(E.D.N.Y)

9. In re Carbon Block Antitrust Litigation, 03-CV-10191, (DPW) (D. Mass.)

10. In re Charter Communications, Inc. Sec. Litig., 02-CV-01186, (CAS) (E.D. Mo.)

11. In re Merrill Lynch & Co., Inc.; Goto.com Research Reports Securities Litigation, 02CV-03835, (JFK)(S.D.N.Y.)

12. In re Saloman Analyst Litigation, 02-CV-06801, (GEL)(S.D.N.Y.)

13. In re Visa/MasterCard Membership Rule Antitrust Litigation, 01-CV-10027, (BSJ)(S.D.N.Y)

14. In re Vivendi Universal, S.A. Sec. Litigation, 02-CV-05571, (RJH)(HBP)(S.D.N.Y.)

15. Ironforge.com v. Paychex, Inc., 08-CV-06818, (SVW) (C.D. Cal.)

1

16. Kirts et al v. Green Bullion Financial Services, LLC et al, 09-CV-07361, (SJO) (MAN) (C.D. Cal.)

17. Mazur v. eBay, Inc. et al, 07-CV-03967, (MHP) (N.D. Cal.)

18. Michael and Natasha Norinsberg v. Carnival Corp. et al, 08-CV-05548, (AHM) (C.D. Cal.)

19. Possin v. Free Credit Report, 10-CV-00156, (JVS) (AN) (C.D. Cal.)

20. Project Lace v. j2 Global Communications, 10-CV-03831, (MMM) (PLA) (C.D. Cal.)

21. Rodriguez et al v. It's Just Lunch International et al, 07-CV-09227, (SHS)(KNF)(S.D.N.Y.)

22. Tidenberg v. Bidz.com, Inc. et al, 08-CV-05553, (PSG) (FMO) (C.D. Cal.)

23. White v. National Home Protection, Inc., 09-CV-04070, (SHS)(S.D.N.Y.)

24. Willard v. Home Depot USA, 09-CV-00110, (RS) (MD) (N.D. Fl.)

25. Worrow v. Register.com et al, 109041/2002, (New York County)

26. Wright v. The State of New York, 112133/2008, (FTC)(NYS Court of Claims – Albany District)